·John RADLEY, Plaintiff,

v.

EASTMAN KODAK COMPANY, Kodak Retirement Income Plan, Kodak Retirement Income Plan Committee, Benefit Plans Committee, Kay Whitmore, John R. McCarthy, Cecil D. Quillen, Jr. and Paul L. Smith, Defendants.

Thomas SLOEY, Plaintiff,

v.

EASTMAN KODAK COMPANY, Kodak Retirement Income Plan, Kodak Retirement Income Plan Committee, Benefit Plans Committee, Kay Whitmore, John R. McCarthy, Cecil D. Quillen, Jr. and Paul L. Smith, Defendants.

John BATTEY–SIPES, Plaintiff,

v.

EASTMAN KODAK COMPANY, Kodak Retirement Income Plan, Kodak Retirement Income Plan Committee, Benefit Plans Committee, Kay Whitmore, John R. McCarthy, Cecil D. Quillen, Jr. and Paul L. Smith, Defendants.

Patricia BODDY, Plaintiff,

v.

EASTMAN KODAK COMPANY, Kodak Retirement Income Plan, Kodak Retirement Income Plan Committee, Benefit Plans Committee, Kay Whitmore, John R. McCarthy, Cecil D. Quillen, Jr. and Paul L. Smith, Defendants.

Richard POTTER, Plaintiff,

v.

EASTMAN KODAK COMPANY, Kodak Retirement Income Plan, Kodak Retirement Income Plan Committee, Benefit Plans Committee, Kay Whitmore, John R. McCarthy, Cecil D. Quillen, Jr. and Paul L. Smith, Defendants.

Nos. 98–CV–6368T through 98–CV–6372T.

United States District Court,
W.D. New York.

Sept. 14, 1998.

Norman M. Spindelman, Fix, Spindelman, Brovitz, Turk, Himelein & Shukoff, P.C., Rochester, NY, for Plaintiffs.

Eugene D. Ulterino, Nixon, Hargrave, Devans & Doyle, LLP, Rochester, NY, for Defendants.

## DECISION and ORDER

TELESCA, District Judge.

### INTRODUCTION

Plaintiffs, John Radley ("Radley"), Thomas Sloey ("Sloey"), John Battey–Sipes ("Battey–Sipes"), Patricia Boddy ("Boddy") and Richard Potter ("Potter") are former employees of the Eastman Kodak Company ("Kodak") who retired on or before July 1, 1991 under Kodak's Retirement Income Plan ("KRIP"). On August 12, 1991, Kodak announced the Resource, Redeployment and Retirement Plan ("RRRP"), which contained more favorable terms than KRIP. Plaintiffs claim, *inter alia,* that Kodak, as plan administrator, breached its fiduciary duty under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1104 and 1140 in that they were materially misled by Kodak benefits counselors, who allegedly told plaintiffs that no enhancements to KRIP would be forthcoming. Plaintiffs claim that, since they were misled into retiring before RRRP was announced, they should be granted the enhanced benefits of that plan retroactively.

In January of 1996, this Court conducted a five-day bench trial in *Ballone et al. v. Eastman Kodak Co. et al.,* (92–CV–6180) limited to the issue of when RRRP was under "serious consideration" by Kodak. This Court determined that serious consideration of RRRP did not occur until July 25, 1991, well after all of the plaintiffs had retired, and, accordingly, dismissed all of the plaintiffs' claims. The Second Circuit Court of Appeals vacated the judgment, holding that "serious consideration is not the sine qua non of materiality," and remanded for further proceedings. *Ballone v. Eastman Kodak Co.,* 109 F.3d 117, 125 (2nd Cir.1997).

On remand, this Court granted defendants' motion pursuant to Fed.R.Civ.P. 21 to sever the *Ballone* action, holding that the plaintiffs' claims were no longer properly joined in light of the Second Circuit's decision. Acting pursuant to the Court's request, the parties agreed to consolidate five of the *Ballone* plaintiffs' cases (Radley, Sloey, Potter, Boddy, and Battey–Sipes) for trial purposes pursuant to Fed.R.Civ.P. 42.

Beginning on August 26, 1998, this Court held a six-day consolidated bench trial during which the following witnesses testified: John and Shirley Radley, Thomas and Doris Sloey, Richard and Gloria Potter, Patricia Boddy, John and Marcia Battey–Sipes, Dale Munroe, Paul Anderson, Kathleen Dexter, Jane Villano, and Russell Olson. This Court also received into evidence the deposition testimony of Corwin Potter in lieu of trial testimony based upon Mr. Potter's stipulated unavailability. This Court received into evidence and carefully reviewed volumes of exhibits, as well as stipulated deposition and trial testimony from the January, 1996 trial of *Ballone et al. v. Eastman Kodak Co. et al.,* 92–CV–6180.

### FINDINGS OF FACT and CONCLUSIONS OF LAW

Testimony during the January, 1996 trial established that in 1990 Kodak announced a substantial amendment to its KRIP retirement plan which took effect as of September 1, 1990. Kodak held informational meetings to explain the changes in the new plan. The amendments eliminated the minimum retirement age and, for the first time, gave employees the opportunity to retire with a partial pension when their age and length of service equaled 75 points or a full pension at 85 points. Also for the first time, a retiree had the choice to receive pension benefits as a lump sum rather than an annuity. These were substantial and favorable amendments to the retirement plan.

Kodak also announced that employees born in the years 1934, 1935, and 1936 who retired before January 1, 1992 would continue to maintain health care coverage under the Blue Cross/Blue Shield Basic and Extended plan. Employees retiring after January 1, 1992 would receive somewhat less favorable "K–Med" coverage.

Several plaintiffs testified that the health care issue was important to them and, therefore, they intended to retire before the end of 1991 in order to benefit from the better

Blue Cross/Blue Shield coverage. Each plaintiff initiated a call to the personnel benefits office and arranged for an interview to determine the impact of the new plan on their retirement goals. Retirement was voluntary.

## I. THE TRIAL TESTIMONY REGARDING ALLEGED MISREPRESENTATIONS

### A. PLAINTIFF JOHN RADLEY

Plaintiff, John Radley, and his wife, Shirley Radley, testified to the details of the counseling session they attended with Kodak Benefits Counselor Dale Munroe ("Munroe"). Mr. Radley began working for Kodak in 1957 and retired on March 1, 1991. He began to seriously consider retirement in January of 1991, after his 55th birthday.

When Mr. Radley called to schedule an individual benefits retirement counseling session, he indicated that he was interested in obtaining information if he were to retire on April 1, 1991 or on June 1, 1991, for comparative purposes. On February 20, 1991, Mr. Radley met with Dale Munroe to discuss Mr. Radley's retirement. Mr. Radley testified that his three main concerns were (1) the amount of his pension; (2) his medical package; and (3) whether there would be any future retirement incentives that he would be missing if he retired at that time.

Mr. Radley testified that he asked Dale Munroe, "with Kodak's history, particularly in the last decade of offering retirement incentives, would there be any such incentives available certainly within the time frame we were discussing which was calendar year 1991." Mr. Radley testified that Munroe's "response was emphatic that there would absolutely not be any future incentives, certainly not in the foreseeable future." Radley also claims that Munroe gave two specific reasons for his assurance that there would be no future enhancement: (1) the 1990 amendments to KRIP were designed to prevent the need for any future retirement incentives, and (2) the "baby boomer" phenomenon, wherein as baby boomers reached retirement age and the workforce was re-duced, there would be no reason to provide retirement incentives.

In his sworn interrogatory responses, Mr. Radley stated that Munroe's response was that Kodak would **"probably never again offer any special incentives, and certainly would not in the foreseeable future."**

Mr. Radley, accompanied by his wife, attended a second counseling session with Mr. Munroe on February 22, 1991. Mr. Radley testified that his wife had only one major concern which was whether her husband would be losing out on retirement incentives such as a year's salary which retired friends of theirs had received from Kodak in the past. Mr. Radley testified that Munroe's response again was that **"there would absolutely not be any future incentives, certainly not in the foreseeable future,"** and that Munroe gave the same two reasons. Mrs. Radley, however, testified that Munroe's response to her inquiry was **"No, he did not know of any."**

At the February 22, 1991 meeting, Mr. Radley decided to retire in April or May of 1991. He alleges that Mr. Munroe said, "Why wait? I can have the papers ready by Thursday and you can retire on March 1." Radley testified that, his concerns having been met, he selected a March 1, 1991 retirement date.

Radley was aware that only the Kodak Board of Directors could change the retirement plan and that he knew a future change was **possible,** so the question he was asking Munroe was whether a future change was **probable.** He also admitted that he never asked Munroe to define "foreseeable future," nor did he ever specifically ask Munroe about calendar year 1991.

### B. PLAINTIFF THOMAS SLOEY

Plaintiff, Thomas Sloey, began working for Kodak in February of 1962 and retired on February 1, 1991. In December of 1990, Mr. Sloey made an appointment to speak with a Kodak benefits counselor. When he called for the appointment, he indicated that he was interested in obtaining information about three possible retirement dates: June of 1991, January of 1992, and January of 1994.

Mr. Sloey was not concerned about the January 1, 1992 deadline for Blue Cross/Blue Shield health care coverage because he was not born in one of the affected years. In other words, he could retire at any time and still be eligible for the Blue Cross/Blue Shield plan. He testified that he planned to work until age 62, which would mean retirement in about January of 1994.

On January 11, 1991, Mr. Sloey and his wife, Doris, met with counselor Dale Munroe to discuss retirement benefits. Mr. Sloey explained that some co-workers told him that he should look into retirement now because he would gain nothing by staying, since he had already achieved the 85 points necessary for retirement with a full pension under the 1990 amendments to KRIP which Munroe confirmed to be correct and said that Sloey should "retire today."

During the counseling session, Munroe informed Mr. Sloey not only about the retirement estimates for the dates Sloey had requested, but also about an estimate for an earlier retirement date of February 1, 1991. Sloey claims that he never requested an estimate for that date. However, there was evidence that Sloey had called the benefits office to request information about February of 1991 and, indeed, had changed from "exploratory" to "final" even prior to his January 11, 1991 session with Munroe.

The estimates showed that Sloey would receive a larger lump sum (approximately $14,000 greater) if he retired in February of 1991, rather than waiting until January of 1992. Mr. Sloey testified that this estimate helped him make the decision to retire in February of 1991.

Mr. Sloey also testified that he asked Munroe whether "there were going to be any more enhanced retirements coming down." Sloey testified that Munroe told him, **"no, Kodak would never have another enhanced retirement."** Sloey claims that he asked Munroe three times and received the same answer each time. Mr. Sloey testified that, based on that assurance (and the estimates) he decided to retire as of February 1, 1991 and agreed to sign the necessary paperwork that day (January 11, 1991).

One of the documents Mr. Sloey signed was a "Retirement Application" which contained the following warning: "I understand that I will not be entitled to any termination allowance payments for any special programs that are announced in the future." Sloey claims that this waiver caused him to again ask, "Dale, are you sure that Eastman Kodak is not going to have another enhanced retirement?" He testified that Munroe's response was, **"Tom, this is just a formality. Believe me, Kodak will never have another enhanced retirement."** Munroe denied that he would ever make such a statement.

Sloey also testified that, in August of 1991, after he became aware of RRRP, he phoned Munroe who apologized and said that "he would never again tell anyone that there wouldn't be an enhanced retirement." Mr. Munroe told Mr. Sloey that he could appeal and gave him the name of the person to contact. Although Mr. Sloey wrote an appeal letter, he was not afforded the RRRP package.

### Benefits Counselor Dale Munroe

Dale Munroe began working for Kodak in 1969 and worked as a benefits counselor from March of 1990 until his retirement in 1996. He is currently an independent contractor who performs services for Kodak. He testified that he has no independent recollection of any specific conversation with any of the retirees he counseled due to the amount of time which has passed since the sessions took place and the fact that he often conducted four to five counseling sessions per day. However, Munroe testified that it was his standard practice to respond to inquiries about future enhancements by saying, "I am not aware of any retirement plan changes." He testified that he also occasionally explained to retirees that the company has a Benefits Planning Department which is always evaluating the plan and that the United States government is always implementing legislation that effects retirement plans. He testified that his prepared answer always ended with "I don't know," and that he sometimes told retirees that "you and I will probably both read about the next plan change in the newspaper tomorrow morning." When asked to give his personal opinion, he told

retirees that he did not believe the plan would change based on the fact that the company had just made the most significant change in its retirement plan in years and also the company's history of not changing its plan so close in time to a recent major change.

Munroe testified that it was not his function to give advice, but rather to explain to retirees the complicated components of the retirement benefits available to them and to inform them of the options available and choices they were required to make (e.g. annuity, lump sum, roll over, etc.) and to record the employee's decisions.

### C. PLAINTIFF RICHARD POTTER

Richard Potter began working for Kodak in 1950 as a messenger and retired on June 1, 1991 as a Director of Technical Services. He began to seriously consider retirement in 1989 after his second heart attack. In early March of 1991, he attended an individual benefits counseling session with Paul Anderson ("Anderson"), the Senior Benefits Counselor. Anderson explained the elements of Potter's retirement benefits and answered Potter's questions. Potter was considering an August 1, 1991 retirement date because he and his wife were planning to move to Virginia. Anderson explained that Potter's accrued vacation could be taken as time off (resulting in a September 1, 1991 retirement date) or cashed out (resulting in an June 1, 1991 retirement date with a lump sum payment in lieu of vacation). Anderson explained to Potter that he would receive approximately $300 less by retiring on June 1, 1991 rather than taking vacation and retiring on September 1, 1991.

On April 19, 1991 Mr. Potter and his wife, Gloria, met with Anderson and informed him that they were considering a June 1, 1991 retirement date with a cash-in-lieu-of-vacation payment. Mr. Potter testified that on the morning of April 19, rumors were running rampant about an enhanced retirement package which would include a year's salary and a Social Security bridge payment. Potter testified that, at the meeting with Anderson, he said, "Paul, I want to make it clear—rumors are going all over the place— what's the story?" Potter testified that Anderson told him that he had already received twenty calls that morning, but that **"the plan introduced in 1990 was the plan and it was his [Anderson's] opinion that there would be no enhanced plan in the foreseeable future."**

### Benefits Counselor Paul Anderson

Paul Anderson ("Anderson"), the Director of the Benefits Counseling Group, testified that he first became aware of RRRP on or about August 2nd or 3rd, 1991. He was informed by his supervisor that a new plan was being developed and he passed that information along to his subordinates (the benefits counselors) in anticipation of increasing caseloads.

Mr. Anderson testified that he counseled many hundreds of employees and, thus, had no independent recollection of any specific conversation(s). However, he testified that his normal practice would have been to respond to inquiries about future plan changes with the prepared response that "I wouldn't be aware of plan changes." He also testified that he would have never rendered an opinion as to future benefits changes. Benefits counselors were instructed not to render opinions as to benefits changes. Nonetheless, Anderson did hold the personal opinion that the retirement plan would probably not change soon after the 1990 amendments because the amended plan was "rich" in comparison to other competitive companies' retirement plans. He considered the September, 1990 plan to be "rich" because it allowed employees to retire much earlier with a full pension and because it allowed them to choose between an annuity and a lump-sum. It also allowed the retirees to receive all of the other standard retirement benefits much earlier than under the previous plan.

Mr. Anderson indicated that all retirements under the 1990 plan were completely voluntary and that it was, in fact, the employee himself or herself who always initiated the process by calling the Benefits Counseling Group to schedule an appointment for a counseling session. The employee would also give the date or dates on which he was

considering retiring. An estimate would then be prepared reflecting, among other things, the amount of annuity or lump-sum pension payment the employee would receive if he ultimately decided to retire on that projected date. After reviewing the estimate(s) and consulting with a benefits counselor, an employee could decide to select his retirement date, in which case signatory forms would be prepared. If the employee needed more information or more time to think about it, he was not forced to retire on the interview date. In fact, an employee could sign all of the necessary paperwork and, if he changed his mind, he could still elect not to retire right up until the effective date of the retirement. If an employee decided not to retire after completing the signature forms, the documents would simply be "set aside" until the employee decided to retire and selected a new date. Retirement was voluntary.

### D. PLAINTIFF PATRICIA BODDY

Patricia Boddy began working for Kodak in 1961 and retired on July 1, 1991 at age 55. Her husband, Corwin Boddy, also worked for Kodak and retired on November 1, 1991 under the RRRP. In the fall of 1990, both Mr. and Mrs. Boddy attended a group session to obtain information about the 1990 amendments to KRIP, particularly the health care benefits changes. Based upon the information they received, the couple transferred their health insurance to Mrs. Boddy's name and determined that she would retire during calendar year 1991 in order to lock in the Basic and Extended Blue Cross/Blue Shield coverage. Mrs. Boddy planned to retire on July 1, 1991. Mr. Boddy would continue to work.

On February 27, 1991, the Boddys scheduled an individual retirement benefits counseling session for Mrs. Boddy for April 4, 1991. On the same date, Corwin Boddy sent two PROFS messages (an intra-company e-mail system) to benefits counselor Katherine Dexter ("Dexter") in which he indicated that the Boddys had decided to set Mrs. Boddy's retirement date for June 28, 1991.

On April 4, 1991, both Mr. and Mrs. Boddy attended an individual counseling session with Dexter. Mrs. Boddy testified that she had been hearing rumors about a new plan and asked Dexter if anything was coming down. Dexter responded, **"No, if there was I'd know about it. There's nothing coming down."** The Boddys and Dexter signed many of the documents necessary for Mrs. Boddy's July 1, 1991 retirement at this meeting.

On April 19, 1991, Corwin Boddy sent another PROFS message to Kathy Dexter indicating that Mrs. Boddy's supervisor had told her during her performance review that an enhancement would be coming in September. On the same day, Dexter responded with a PROFS message that indicated, **"I am sorry, but we are not aware of any enhancements."** (Exhibit 321).

In May of 1991, the Boddys had another meeting with Dexter during which Mrs. Boddy said, "Kathy, I'm still hearing rumors— are you absolutely sure?" Dexter responded, **"Yes, Pat, I'm absolutely sure."** In late June of 1991, Mrs. Boddy had a third and final meeting with Dexter in which Mrs. Boddy handed in her parking pass and obtained a new retiree photo identification pass. Mrs. Boddy testified that she said, "Kath, are you absolutely sure that nothing is coming down?" Dexter responded, **"Pat, I'm absolutely positively sure. Take your retirement and enjoy it."** Mrs. Boddy's last day of work was June 21, 1991. She took one week of vacation time and retired on July 1, 1991.

### Benefits Counselor Katherine Dexter

Katherine Dexter is still currently employed by Kodak and has worked there for over 26 years. She became a benefits counselor in January of 1989. Like the other benefits counselors, Ms. Dexter has no independent recollection of any specific conversation or counseling session. She testified that her standard response to inquiries about future enhancements to the benefits plan was that she was not aware of any enhancements. She denies that she would ever make the statement that the plan would "absolutely not change" because the plans are always subject to change.

### E. PLAINTIFF JOHN BATTEY–SIPES

Plaintiff, John Battey–Sipes, began working for Kodak in 1961 and retired on July 1, 1991. His 55th birthday was on June 19, 1991 and, therefore, July 1, 1991 was the first possible day on which he could retire with a full pension under KRIP. He and his wife (who also worked for Kodak) attended a number of group informational sessions in the fall of 1990 regarding the 1990 plan amendments. He testified that the January 1, 1992 retirement deadline for receiving Blue Cross/Blue Shield medical insurance was important to him, since he regarded Blue Cross/Blue Shield superior to the alternative K–Med coverage.

Battey–Sipes arranged a benefits counseling session, which was held on April 19, 1991 with benefits counselor Jane Villano ("Villano"). He testified that he asked Villano about rumors he had been hearing and that she laughed and said **"You know Kodak. There's always rumors."**

They continued the session until they reached the Retirement Application which stated, "I understand that I will not be entitled to any termination allowance payments for any special programs that are announced in the future." (Exhibit 172, p. 22.) Mr. Battey–Sipes expressed hesitancy to sign the form and again questioned Villano about the rumors. He testified that she responded, **"John, that's just a bunch of rumors. There's nothing to it. Nothing's going to change the rest of this year."** He also testified that Villano said, **"Just take your three weeks vacation. It's going to be a beautiful summer. Nothing is going to change the rest of this year. You won't get anything by staying any longer. You worked at Kodak long enough to know there's always rumors. There's nothing to it."**

On April 19, 1991, Battey–Sipes signed the necessary documentation for a July 1, 1991 retirement date. However, after his counseling session, he testified that he called Villano another four to six times to discuss the rumors and that each time he received substantially the same response. Battey–Sipes' final call to Villano was on Friday, June 28, 1991, which was his last day of work (and his last available day to revoke the July 1, 1991 retirement date). He testified that she again told him **"John, nothing's going to happen. Retire and enjoy the summer."** Mr. Battey–Sipes retired on July 1, 1991.

On August 12, 1991, Battey–Sipes learned of RRRP through an article in a local newspaper. He testified that he was "flabbergasted" and felt "betrayed" by Kodak. On August 13, 1991, he went to Kodak and asked to speak to the person in charge of benefits. He was directed to Patrick McLarney, Director of Compensation and Benefits.

Battey–Sipes asked McLarney if the new program would be made retroactive for recent retirees, as Kodak had done in the past. When McLarney said "no," Battey–Sipes asked how Kodak came up with the new program so quickly when Villano had told him that the plan would not change for the rest of the year. Battey–Sipes testified that McLarney said, "we only worked on this a short time." Battey–Sipes asked what he meant by "a short time," and McLarney said, "two months." Battey–Sipes indicated that he was still working at Kodak two months ago and asked why Villano did not tell him. He testified that McLarney stood up and, while walking away, said over his shoulder, "Sue us"—which option he and other retirees pursued.

Battey–Sipes made notes of the conversation with McLarney. Exhibit 187 is a handwritten note which states,

August 13, 1991. See Patrick McLarney. 1.) Will the new retirement be made retro. He said no, they only worked on it for 2 months. 2.) Why didn't Jane Villano tell me something new was coming when I kept calling her? He stood up walking away and said why don't you sue us.

After the meeting with McLarney, Battey–Sipes visited his attorney, who wrote a letter to Kodak on his behalf asking that Mr. Battey–Sipes be included in the new plan. Although the letter states that plaintiff "discussed this situation with several individuals," it does not mention Mr. Battey–Sipes' conversations with either Villano or McLarney. (Exhibit 188).

On cross-examination, Battey–Sipes admitted that he knew that only "upper management" could change the plan and that the plan could change at any time. He also admitted that he never asked Villano whether Kodak had made a decision to either change or not change the plan.

### Benefits Counselor Jane Villano

Jane Villano, who has worked as a benefits counselor since 1979, testified that she had no independent recollection of any specific conversation with any prospective retiree. She testified that her standard response to an inquiry as to future plan changes would be that "we are not aware of anything." She testified that she would never say that there would be no change and that she would never give her personal opinion.

### THE "KRIPCO ISSUE"

Plaintiffs allege that actions taken by the Kodak Retirement Income Planning Committee ("KRIPCO") (the entity responsible for investment of Kodak's pension assets) reflect that Kodak was aware that there would be an enhanced retirement program at least as early as June 25, 1991. On that date, the KRIPCO Committee met and authorized the liquidation of $275 million in assets. Plaintiffs claim that this liquidation was in preparation for what was eventually announced as RRRP.

This issue was also raised during the first trial of this matter and this Court found then that "the June 25, 1991 liquidation of KRIPCO assets was not intended to fund RRRP." (January 26, 1996 Decision and Order, p. 26). That factual finding was not disturbed on appeal. However, in light of the broad parameters of the Second Circuit's decision, plaintiffs were allowed to introduce additional evidence to support their theory.

### RUSSELL OLSON

Russell Olson, Kodak's Director of Pension Benefits, testified that it was his responsibility to advise KRIPCO with respect to investment recommendations, although he is not a member of the KRIPCO committee.

At the June 25, 1991 meeting of KRIPCO, Mr. Olson recommended liquidation of $275 million of assets to be placed in Kodak's temporary cash account housed in the Boston Safe Deposit and Trust Company. He testified that the account was used for making payments to Metropolitan Life ("MetLife") and to pay for "unfunded commitments" such as private investments and overlay programs. The overlay programs involved speculative investments such as futures and commodities trading. Accordingly, Kodak sought to maintain a cash balance of at least $150 million in the Boston account to cover sudden, unexpected losses in those areas.

Mr. Olson testified that in 1991, KRIPCO's expected contribution to MetLife was $279 million. Kodak made three payments totaling $260 million in July and early August of 1991. Mr. Olson testified that he attended the June 25, 1991 KRIPCO meeting and that there was absolutely no discussion of the need to fund any anticipated enhanced benefit programs during the meeting. He first learned of the enhanced program during the first week of August, 1991, after he returned from a two-week vacation.

Mr. Olson testified that the introduction of RRRP significantly increased Kodak's obligation to MetLife, thus requiring an additional three payments in November and December of 1991 totaling nearly $275 million. He informed the fund managers in October that additional liquidations would soon be necessary. KRIPCO officially authorized liquidation of the additional $275 million during its November 25, 1991 meeting and directed that the money be raised within three weeks. At the time of the meeting, over $97 million of those funds had already been liquidated in anticipation of the authorization.

Plaintiffs argue that Kodak's cash on hand as of May 31, 1991 was more than sufficient to pay for its "unfunded commitments," and, accordingly, that the only logical inference is that the $275 million authorized at the June 25, 1991 KRIPCO meeting was earmarked for an anticipated downsizing program. Plaintiffs assert that the fact that no other action was taken by KRIPCO until November is further support for the argument that KRIPCO already knew about an enhanced plan and had prepared for it as of June 25, 1991.

I find Mr. Olson's testimony to be credible that he had no knowledge of the enhanced retirement program until August of 1991 and that there was no discussion of funding any downsizing or enhanced retirement program at the June 25, 1991 KRIPCO meeting. The $275 million liquidation authorized by KRIPCO on June 25, 1991 was to pay ongoing commitments and to maintain a minimum cash balance to cover losses in short term speculative investments, not in anticipation of RRRP.

## II THE LEGAL STANDARD TO BE APPLIED IN THIS CIRCUIT

*Breach of Fiduciary Duty—29 U.S.C. § 1104*

As a plan administrator under ERISA, it is undisputed that Kodak has a fiduciary duty to

> (1) ... discharge [its] duties with respect to [the] plan solely in the interest of the participants and beneficiaries and ...

> (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]

29 U.S.C. § 1104. It is "well-settled that plan fiduciaries may not affirmatively mislead plan participants about changes, effective or under consideration, to employee pension benefit plans." *Pocchia v. NYNEX Corp.*, 81 F.3d 275, 278 (2nd Cir.1996). *See also Mullins v. Pfizer Inc.*, 23 F.3d 663, 669 (2nd Cir.1994) ["a plan administrator may not make material misrepresentations to plan participants about changes to an employee benefits plan."].

By Decision and Order dated January 26, 1996, this Court previously determined, after a five-day bench trial, that none of the plaintiffs were materially misled about the potential for the adoption of a more favorable plan since RRRP was not under "serious consideration" by Kodak prior to July 1, 1991 (which is the latest date on which any of the ninety-nine *Ballone* plaintiffs retired). After detailed factual findings, this Court found that RRRP was not under "serious consideration" until July 25, 1991 and, accordingly,

dismissed the plaintiffs' breach of fiduciary duty claims.

On March 21, 1997, the Second Circuit Court of Appeals vacated the judgment of this Court and remanded for further proceedings consistent with its opinion. Although the circuit court left undisturbed this Court's factual findings, it nonetheless concluded that this Court had erred in "attributing talismanic significance" to the serious consideration finding, noting that " '[s]erious consideration' of plan changes is not the sine qua non of materiality." *Ballone*, at 122, 125. The Court announced additional factors which this Court should consider in determining whether the plaintiffs were misled in violation of ERISA.

The Second Circuit's conclusion is difficult to reconcile with other relevant precedent established in the First, Third, Sixth, and Tenth Circuits, all of which have determined that "serious consideration" is dispositive of the materiality inquiry. *See Vartanian v. Monsanto Co.*, 131 F.3d 264 (1st Cir.1997) [distinguishing *Ballone* ]; *Fischer v. Philadelphia Elec. Co.*, 96 F.3d 1533, 1538 (3rd Cir.1996) ("Fischer II") ["... in any case where the misrepresentation in question is the statement that no change in benefits is under consideration, the only factor at issue is the degree of seriousness with which the change was in fact being considered. This factor controls the materiality test ..."]; *Muse v. International Business Machines Corp.*, 103 F.3d 490, 494 (6th Cir.1996) ["... misrepresentations made before serious consideration trigger no [fiduciary] duty"]; *Hockett v. Sun Company, Inc.*, 109 F.3d 1515 (10th Cir.1997) ["... material misrepresentations about a future plan offering do not constitute a breach of fiduciary duty unless the misrepresentations are made after the employer has 'seriously considered' the future offering."].

Indeed, the Second Circuit's *Ballone* decision is not only in conflict with the precedent of other circuits, but is also particularly difficult to reconcile with its own decision in *Pocchia v. NYNEX Corp.*, 81 F.3d 275, 278 (2nd Cir.1996) which held that:

> Until a plan is adopted, there is no plan, simply the possibility of one. Insisting on

voluntary disclosure during the formulation of a plan and prior to its adoption would, we think, increase the likelihood of confusion on the part of beneficiaries and, at the same time, unduly burden management, which would be faced with continuing uncertainty as to what to disclose and when to disclose it. Moreover, any requirement of pre-adoption disclosure could impair the achievement of legitimate business goals.

*Pocchia v. NYNEX Corp.,* 81 F.3d at 278.

Furthermore, in *Mullins v. Pfizer, Inc.,* 23 F.3d 663, 669 (2nd Cir.1994), the Second Circuit noted that "we do not require an ERISA fiduciary to be perfectly prescient as to all future changes in employee benefits. Nor do we require a fiduciary to disclose its internal deliberations."

■ Nonetheless, I must apply the framework set forth by the Second Circuit in *Ballone* to the facts of these cases. Accordingly, this Court must first determine whether the defendants made any misrepresentation to any plaintiff—i.e. "statements which the employer knows to be false or that have no reasonable basis in fact." *See Ballone* at 126. If so, this Court must then decide whether the misrepresentation was "material" in light of the multi-factor test set forth by the Second Circuit. *See Ballone* at 125. Finally, should I find that a material misrepresentation was made, I must then determine whether the plaintiff reasonably relied on the misrepresentation to his or her detriment. *See Ballone* at 126. The ultimate inquiry remains "whether there is a 'substantial likelihood' that the affirmative misrepresentation 'would mislead a reasonable employee in making an adequately informed decision about if and when to retire.'" *Ballone,* at 122–123, *quoting Fischer v. Philadelphia Elec. Co.,* 994 F.2d 130, 135 (3rd Cir.1993) (Feinberg, J., sitting by designation).

After receiving six days of evidence, including detailed testimony about the specific statements made, and after reviewing thousands of pages of exhibits (including deposition and trial testimony from the first trial of this case), I find that the defendants did not materially mislead plaintiffs Radley, Sloey, Potter, Boddy or Battey–Sipes.

## I. Misrepresentations

■ I find that none of the plaintiffs were given false assurances or guarantees when counseled by Kodak personnel in 1991 about rumored future plan changes. The explanations given were accurate statements of then-existing facts or, at most, personal predictions or opinions about whether they believed the plan then in effect would change in the near future. Those predictions or opinions were made with a "reasonable basis in fact." The statements were reasonable under the circumstances which existed at the time they were made, including the fact that Kodak had recently made a substantial and favorable change to KRIP in 1990 (the first such change in many years) which was intended by management to eliminate the need for retirement enhancements.

## II. Materiality

■ I find based on the evidence that any of the alleged misrepresentations were not "material" as defined by the Second Circuit's multi-factor analysis. *See Ballone* at 125.

### A. Status of Internal Deliberations

A factor in determining materiality is "how significantly the statement misrepresents the present status of internal deliberations." *Id.* As of June 28, 1991, the latest date on which the alleged misrepresentations were made, Kodak had not even begun to contemplate the need for a company-wide voluntary downsizing, nor the means by which it would be accomplished.

As this Court found in its January 26, 1996 Decision, Kay Whitmore, Kodak's then C.E.O., met with Larry Matteson, head of the Electronic Imaging Group ("EIG"), Frank Strong, Director of Kodak's Commercial Imaging Group ("CIG"), and William Fowble, General Manager of the Photographic Products Group ("PPG"), on June 26, 1991, for EIO's annual performance review. At that meeting, the decision was made to reduce Kodak's investment level in EIO and Whitmore directed Matteson, Strong and Fowble to develop proposals for reducing costs.

Within the next several days, Matteson, Strong and Fowble met to discuss options. Matteson met with his key people, including Roy Johnert, the Personnel Director for EIO and CIG, and discussed the need to evaluate downsizing as a potential option. Johnert contacted Patrick McLarney, Director of Corporate Compensation and Benefits, to explore approaches to downsizing EIO and CIG. On July 2, 1991, Johnert met with Jack Kellogg, Manager of Benefits Planning and Consulting Services, to discuss gathering information for an anticipated voluntary downsizing in late 1991 for EIO and CIG. On July 3, 1991, Kellogg met with the Kodak Tax and Legal Departments to discuss downsizing options and Johnert directed Kellogg for the first time to enlarge the demonstrative data beyond EIO and CIG, to include all Rochester Reporting Units.

Although the dates of the Matteson–Johnert and Johnert–McLarney meetings are not clearly indicated in the record (sometime after June 26, 1991 and before July 2, 1991), it is clear that as of June 28, 1991, the latest date on which any of the plaintiffs claim they were given misleading information, Kodak had not yet begun to contemplate a company-wide downsizing and certainly had not even explored the possibility of an enhanced retirement plan as the means to accomplish any anticipated downsizing. The only "internal deliberation" as of June 28, 1991, was the EIO annual performance review in which a decision was made to reduce the investment level for the Electronic Imaging Group—certainly not the type of information which the counselors would be expected to be aware of or to pass along to potential retirees. Accordingly, the counselors' statements in January, February, March, April, May and June of 1991 that "we are not aware of any enhancements" or even that "no enhancements are coming," were true statements when made and did not misrepresent the status of internal deliberations because, as of those dates, there was no enhanced retirement incentive even being considered or discussed among Kodak management.

This Court previously determined that "serious consideration" of RRRP began on July 25, 1991—a factual finding which was not disturbed by the Second Circuit. Although the *Ballone* court noted that " 'serious consideration' is not the sine qua non of materiality," *Ballone* at 125, it nonetheless acknowledged that ". . . the more seriously a plan change is being considered, the more likely a misrepresentation, [e.g. that no change is under consideration,] will pass the threshold of materiality." *Ballone* at 123 *citing Mullins v. Pfizer, Inc.*, 23 F.3d 663, 669 (2nd Cir.1994), *quoting Fischer*, 994 F.2d at 135 (language in brackets was quoted in *Mullins* but omitted in *Ballone*). At the time the plaintiffs retired, the RRRP was *not* only not under "serious consideration," it was simply not being considered *at all*. It was not until July 3, 1991 (two days after plaintiffs Boddy and Battey–Sipes retired and months after Radley, Sloey and Potter retired), that Kodak even began to gather preliminary data regarding a possible downsizing involving the Rochester Reporting Units. Only after the release of the devastating second quarter earnings statement in mid-July did C.E.O. Kay Whitmore become committed to the need for a company-wide downsizing and eventually, in late July, determined that it would be accomplished through a voluntary enhanced retirement plan.

The counselors' statements did not misrepresent the status of internal deliberations at the time they were made.

B. *Special Relationship of Trust and Confidence*

The second factor in determining whether the alleged misrepresentations were material is the "special relationship of trust and confidence between the plan fiduciary and beneficiary." *Ballone* at 125, *citing Varity Corp. v. Howe*, 516 U.S. 489, 116 S.Ct. 1065, 1075, 134 L.Ed.2d 130 (1996). There is no doubt, in the wake of *Varity*, that the scope of a plan administrator's fiduciary duty under ERISA is broad. *See* 116 S.Ct. at 1073–75. However, it should be noted that the facts of *Varity* are clearly distinguishable from the instant case. *Varity* involved a case in which the employer made affirmative misrepresentations about the security of its employees' non-pension benefits to induce the employees to transfer to a division of the company that

the employer had created as a dumping ground for its failing businesses. *Ballone* at 123, *citing Varity,* 116 S.Ct. at 1068–69.

Citing *Varity,* and *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.,* 57 F.3d 1255 (3rd Cir.1995), in which the employer affirmatively misrepresented to employees that medical benefits were guaranteed when the company knew it was not true, the *Ballone* court·stated that "it is clear that Kodak may not actively misinform its plan beneficiaries about the availability of future retirement benefits to induce them to retire earlier than they otherwise would." *Ballone* at 124.

I find that plaintiffs have failed to adduce any evidence that Kodak personnel knowingly or actively misinformed plaintiffs about the availability of future benefits to induce them to retire earlier than they otherwise would. The plaintiffs voluntarily made appointments with the benefits counselors to discuss retirement benefits and voluntarily selected their own retirement dates. They were not forced to retire nor duped into retiring by Kodak or any of its representatives. Nor was there evidence that any of the counselors had any motive to misinform or deceive any of the retirees.

Accordingly, the "special relationship of trust and confidence" between the plan fiduciary and beneficiary was not abused by intentional deception. Kodak's representatives may have spoken improvidently by offering prognostications of the future which turned out to be wrong. However, those predictions and opinions were offered only after being sought by the plaintiffs and when made, they did have a reasonable basis in fact.

### C. *Other Information Available to the Employee*

The third factor in determining materiality is

> whether the plaintiff was aware of other information or statements from the company tending to minimize the importance of the misrepresentation or should have been so aware, taking into consideration the broad trust responsibilities owed by the plan administrator to the employee and the

employee's reliance on the plan administrator for truthful information.

*Ballone* at 125. I find that these plaintiffs were made aware of other information from Kodak tending to minimize the importance of the alleged misrepresentations.

All written materials provided to the plaintiffs made clear that the retirement plan could change at any time. For instance, the individualized package of retirement documents which each counselor reviewed with each prospective retiree (referred to by the parties as the "red folder") contained two clearly written warnings to the prospective retiree that the retirement plan was subject to change and that the retiree would not be eligible for any future special programs. A document entitled "Personal Retirement Summary" contains the retiree's name and retirement date, and the following warning:

> Note: The materials contained in this notebook are estimates and summaries based on the benefit plans currently in effect. The company retains the right to review these benefit plans and make modifications from time to time as may be appropriate.

(Exhibit 323, p. 38). Another document in the red folder entitled "Retirement Application" clearly states that **"I understand that I will not be entitled to any termination allowance payments for any special programs that are announced in the future."** (Exhibit 323, p. 45) All five plaintiffs signed the Retirement Application containing this specific warning.

Furthermore, the summary plan description, "You and Kodak," contains a section regarding KRIP which has a heading entitled "Plan Modifications" stating that "[t]he Kodak Board of Directors reserves the right to modify or amend the plan at any time...." (Exhibit 196, p. 113). "You and Kodak" also contains a general provision entitled "Plan Modifications and Termination" which states that

> [w]hile Eastman Kodak Company intends to continue the benefit plans as described in this book, any plan may be modified or terminated at any time by action of the· Board of Directors.· Although the board has total discretion to amend or terminate any plan, it generally exercises that discre-

tion in response to a change in the environment which existed when the plan was originally adopted or subsequently amended. For example, the board might decide to modify or terminate a plan because of changes in applicable laws or regulations, changes in the company's economic or business situation, or changes in the apparent needs of employees....

(Exhibit 196, p. 178).

Finally, in an article in the September 6, 1990 issue of the *Kodakery*, Kodak's employee newsletter, Patrick McLarney, Director of Compensation and Benefits, stated that "as the ever changing government regulations and economic environment require it, we will make changes [to KRIP] when necessary. However, employees thinking about retirement should base their decisions on the current situation, not on rumored changes that may not occur." (Exhibit 149).

In light of these clear written warnings, the plaintiffs were placed on notice that the plan changes could be possible and that they would not be entitled to any additional benefits announced in the future.

This is particularly true in light of ERISA's strong policy preference for the primacy of the written word over conflicting oral representations. *See for example Moore v. Metropolitan Life Ins. Co.*, 856 F.2d 488, 492 (2nd Cir.1988) ["... ERISA's framework ... ensures that plans be governed by written documents ... and that SPDs (summary plan descriptions), drafted in understandable language, be the primary means of informing participants and beneficiaries. Congress intended that plan documents and the SPDs exclusively govern an employer's obligations under ERISA plans.... Were all communications between an employer and plan beneficiaries to be considered along with the SPDs as establishing the terms of a welfare plan ... [p]redictability as to the extent of future obligations would be lost, and, consequently, substantial disincentives for even offering such plans would be created." (internal citations omitted) ]. *See also Frahm v. Equitable Life Assurance Society of the United States*, 137 F.3d 955, 960 (7th Cir.1998) ["[t]reating § 1104(a) as establishing a duty to give plan participants whatever benefits someone on the staff led them to believe were available would undermine an essential principle established by ERISA: there are no oral variances from written plans."]

Each plaintiff was informed that the retirement plan was subject to change at any time and that he/she would not be entitled to future enhancements. Each testified that he/she heard rumors that future enhancements might be forthcoming. All five plaintiffs had the option to wait until January 1, 1992 to retire and still received the favorable health care benefits they sought. Nonetheless, each voluntarily chose to retire when he/she did for their own personal reasons. At the time all five plaintiffs retired, Kodak was not contemplating offering an enhanced retirement plan and the plaintiffs were correctly so informed by their benefits counselors.

The benefits counselors may have, when asked, offered erroneous opinions or predictions that the plan would not change in the near future, but at that time and based upon what they knew, they did not and, indeed, could not give guarantees that the plan would not change in the future. There is no dispute that plaintiffs have received every component of the retirement package they were entitled to, including, for example, a pension benefit with lump-sum or annuity option, Savings and Investment Plan ("SIP"), Kodak Employee Stock Ownership Program ("KE-SOP"), life insurance, medical insurance, wage dividends, survivor benefits, vacation pay, together with any other forms of compensation to which each were entitled.

### D. Specificity of the Assurance

The final factor in determining materiality is the specificity of the alleged assurance. *Ballone* at 125. The Second Circuit has stated that, "[w]hereas mere mispredictions are not actionable, false statements about future benefits may be material if couched as a guarantee, especially where ... the guarantee is supported by specific statements of fact." *Ballone*, at 125.

None of the five plaintiffs have testified that Kodak representatives gave them guarantees or assurances supported by specific

statements of fact. These plaintiffs do not allege that any counselor told them that changes had been ruled out for any specific period of time or, more importantly, that a corporate decision had been made not to amend the plan. No plaintiff testified that his/her counselor stated that the plan could not change for specific reasons such as government regulations or financial considerations. Rather, all five plaintiffs allege that the counselors' representations were general statements such as "no changes are coming in the foreseeable future," which were true when made but which later turned out to be incorrect when the company subsequently announced RRRP in August 1991. In fact, Mr. Sloey's allegation that Dale Munroe said that "Kodak will never have another enhanced retirement" is precisely the type of statement which the *Ballone* court characterized as "too speculative and unbelievable to 'mislead a reasonable employee ...'" *Ballone* at 125.

After careful consideration of the plaintiffs' allegations and in light of the framework outlined by the Second Circuit, I find that Kodak did not make any material misrepresentations to plaintiffs Radley, Sloey, Boddy, Potter, or Battey–Sipes. Accordingly, it is unnecessary to address the issue of plaintiffs' reliance. Plaintiffs' claims for breach of fiduciary duty under 29 U.S.C. § 1104 are dismissed.

*Plaintiffs' Discrimination Claim, ERISA § 510 (29 U.S.C. § 1140)*

Plaintiffs' complaint also alleges a claim for violation of § 510 of ERISA, which provides that:

> [i]t shall be unlawful for any person to discharge, fine, suspend, expel, discipline or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan[.]

29 U.S.C. § 1140.

During the first trial of this matter, the plaintiffs claimed that Kodak "tipped off" certain employees that enhanced pension benefits would be available and that those employees delayed retirement to take advantage of the enhanced plan. This Court dismissed the § 510 claim, finding that there had been no discrimination. The Second Circuit vacated this Court's judgment since the dismissal was on "substantially the same grounds" as dismissal of the fiduciary duty claims. On remand, plaintiffs have not raised the discrimination issue, nor did they introduce any new evidence on it during the second trial. Nonetheless, for the reasons discussed above and in light of the undisturbed factual findings from the first trial, I find that plaintiffs were not induced to retire or "discriminated against" by Kodak in violation of § 510. Accordingly, plaintiffs' ERISA § 510 claim is dismissed.

*Plaintiffs' Equitable Estoppel Claim*

Plaintiffs also claims that the Kodak should be equitably estopped from refusing to provide them with the RRRP benefits. Equitable estoppel applies in ERISA cases only under "extraordinary circumstances." *Schonholz v. Long Island Jewish Medical Center*, 87 F.3d 72, 78 (2nd Cir.1996); *Bonovich v. Knights of Columbus*, 146 F.3d 57 (2nd Cir.1998). The elements include (1) a material misrepresentation; (2) reliance; and (3) damages. *Lee v. Burkhart*, 991 F.2d 1004, 1009–10 (2nd Cir.1993). As discussed above, no material misrepresentations were made to plaintiffs Radley, Sloey, Potter, Boddy, or Battey–Sipes. Accordingly, plaintiffs' equitable estoppel claim is dismissed.

### CONCLUSION

Plaintiffs have produced no evidence of a corporate scheme by Kodak to deceive or defraud any of these retirees. All five plaintiffs have admitted that they voluntarily took retirement when they did for individual and personal reasons. Plaintiffs admit that none of the counselors intentionally lied to them about future changes to the retirement plan. Moreover, plaintiffs were given written notice that the retirement plan could change at any time and signed a waiver acknowledging their understanding that they would not be entitled to "any special programs that are announced in the future." Plaintiffs also admit that each received their total entitlement under the enhanced retirement plan adopted in September 1990 as promised to them.

104

The plaintiffs were not guaranteed by their counselors or anyone at Kodak that the retirement plan would never change, nor were they entitled to such a guarantee. The most that plaintiffs have shown is that their benefits counselors may have made incorrect personal predictions or gave personal opinions which turned out to be erroneous when viewed with the benefit of hindsight. However, the counselors' statements had a reasonable basis in fact when made, including, *inter alia*, the fact that the company had just made a significant improvement to its retirement plan in 1990 which was intended to eliminate the need for future enhancements and that no new retirement incentives were being contemplated by Kodak on June 28, 1991, the latest date on which any of the counselors' statements were made. The fact that higher management subsequently decided to change course and engage in voluntary downsizing by implementing an enhanced retirement plan does not convert the counselors' reasonable predictions and opinions when made into actionable misrepresentations. ERISA's fiduciary duty requires simple honesty when the statements were made—not guarantees of future events. The plaintiffs may feel "betrayed and hurt" by a company they trusted and to which they gave many years of loyal service because the benefits of RRRP were not applied retroactively to them. But that was a policy decision by Kodak which I cannot alter to accommodate plaintiffs' request. Understandably, the plaintiffs were deeply disturbed and disappointed but they were not legally wronged. They received every benefit they were told they would receive when each made their decision to retire.

Accordingly, plaintiffs' claims for breach of fiduciary duty, 29 U.S.C. §§ 1104 and 1140, equitable estoppel, and violation of ERISA § 510 are dismissed. Plaintiffs Radley, Sloey, Potter, Boddy, and Battey–Sipes' complaints are dismissed in their entirety.

ALL OF THE ABOVE IS SO ORDERED.