Dolores FRAHM, et al., Plaintiffs–
Appellants,

v.

The EQUITABLE LIFE ASSURANCE
SOCIETY OF the UNITED STATES,
Defendant–Appellee.

No. 97–1912.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 3, 1997.

Decided Feb. 27, 1998.

Lionel I. Brazen, Chicago, IL, Mark D. DeBofsky (argued), DeBofsky & DeBofsky, Chicago, IL, for Plaintiffs–Appellants.

Wilber H. Boies (argued), McDermott, Will & Emery, Chicago, IL, for Defendant–Appellee.

Before CUDAHY, EASTERBROOK, and EVANS, Circuit Judges.

EASTERBROOK, Circuit Judge.

Insurance agents affiliated with the Equitable Life Assurance Society receive medical benefits, as do retired agents. In 1988 the Equitable instituted a copayment program for all active and some retired agents; its right to do this was secure under both the medical care plan and the summary plan descriptions, which reserved the right to change the plan's terms (or end the plan altogether) at any time. *See Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 565 (7th Cir.1995); *Senn v. United Dominion Industries, Inc.*, 951 F.2d 806, 814–16 (7th Cir. 1992). In 1991 the Equitable made additional changes for active agents, giving them a choice of plans but also (the district judge found) establishing "significantly higher payment obligations on its participants and beneficiaries with respect to premiums, deductibles, co-payments, and maximum out-of-pocket limitations. It also imposed certain cost-sharing obligations, even on those who had been exempted from earlier cost-sharing measures." In 1993 the Equitable extended the active agents' medical benefits program to all retired agents under the age of 65. Six affected retirees filed this suit under ERISA. The district judge conducted a bench trial and entered judgment for the Equitable after concluding that none of plaintiffs' theories justified stripping the employer of its reserved power to change the health plan at any time—a power it was free to use without having to show that the changes were beneficial to the active or retired agents. See *Lockheed Corp. v. Spink*, 517 U.S. 882, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996); *Johnson v. Georgia–Pacific Corp.*, 19 F.3d 1184 (7th Cir.1994).

Plaintiffs sought to represent a class of all retired agents who preferred the

old plan to the new. The district court certified the case as a class action to the extent it presents the question whether retirement causes health benefits to vest at whatever level was in place on each agent's retirement date and granted summary judgment for the Equitable, finding the reservation-of-rights clauses in the plan (and summary plan descriptions) too clear to admit of argument. Plaintiffs have not appealed from this aspect of the judgment. What led to the trial was not ambiguity in the plan or associated documents, as in *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603 (7th Cir.1993) (en banc), but conflicting evidence about representations made to the plaintiffs personally. They contended that the Equitable had made individual contracts with them establishing rights on top of those created by the health benefits plan; they also argued that oral statements and letters during discussions about their retirements violated the employer's fiduciary duty under ERISA or estopped it to enforce the plan according to its terms. On these issues the district court declined to certify a class—and sensibly so. Plaintiffs relied on Fed.R.Civ.P. 23(b)(3), and a judge may certify a class under that subdivision only if "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and ... a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Common questions predominated with respect to the vested-benefits claim; for all other claims everything depends on what was said or sent to each agent personally, and different benefits advisers said or wrote different things to different agents. Individual rather than class litigation is the best way to resolve person-specific contentions when the stakes are large enough to justify individual suits. *Sprague v. General Motors Corp.*, 133 F.3d 388, 397–99 (6th Cir.1998) (en banc); *In re Rhone–Poulenc Rorer Inc.*, 51 F.3d 1293 (7th Cir.1995). What is more, plaintiffs' request that we direct the district judge to certify the case as a class action across the board calls into question their adequacy as class representatives. See Fed. R.Civ.P. 23(a)(4). They litigated and lost; do they want to take all other retirees down

in flames with them? "[A] class representative who has lost on the merits may have a duty to the class to *oppose* class certification, to avoid the preclusive effect of the judgment". *Bieneman v. Chicago*, 838 F.2d 962, 964 (7th Cir.1988) (emphasis added). Plaintiffs' request to extend the class certification is not contingent on prevailing on the merits, and anyway Rule 23's criteria do not depend on who wins in the end. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176–78, 94 S.Ct. 2140, 2151–53, 40 L.Ed.2d 732 (1974). But because the district judge did not abuse his discretion in concluding that the case fails to satisfy Rule 23(b)(3), we need not decide whether plaintiffs also fall short as representatives of other retirees' interests.

Let us begin with the plaintiffs' argument that the Equitable made with each of them a bilateral contract whose terms differ from those of the firm-wide health care plan. Each plaintiff claims a right, for life, to the health care benefits in force on his or her date of retirement. The Equitable denies that a personal agreement is possible, but we see no reason in principle why not. A pension plan must be established as a trust, and for that reason it is hard to create single-employee pension contracts—although employers can make promises that work very much *like* pensions, provided they fall outside of ERISA. Compare *Nagy v. Riblet Products Corp.*, 79 F.3d 572 (7th Cir.1996), with *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073 (7th Cir.1992). Welfare benefit plans, a category that includes medical plans, 29 U.S.C. § 1002(1)(A), may be set up informally and funded by an employer's general revenues. Almost any fringe benefit other than a pension is a "welfare plan" under the catchall clause in § 1002(1)(B)—including vacation pay, holiday bonuses, severance payments, and other elements of compensation that are not directly reflected in the hourly wage. (All of these examples are listed in 29 U.S.C. § 186(c), to which § 1002(1)(B) refers. See also *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987).) Bilateral agreements on the length of vacation and amount of severance pay are common, and if these are proper then bilateral agreements about health care also must be proper. A firm could award severance pay

equal to the expected difference between the firm's medical plan and full coverage, leaving the employee to buy a policy covering the gap. If this is proper, what's wrong with a promise to provide medical care in kind? The sixth circuit's en banc decision in *Sprague* observes that plans must be in writing, which sets limits on the scope of bilateral agreements, but the court did not deny that such agreements are *possible* if required forms are observed.

■ A conclusion that bilateral contracts about welfare benefits are possible gets plaintiffs nowhere, however, unless they also established that they formed such contracts. The district court held that they had not done so, principally because their early retirements did not give the Equitable any consideration for a promise of lifetime benefits. Plaintiffs not only did not give the Equitable a benefit but also, the district court remarked, did not incur any detriment: they remain eligible to sell the Equitable's policies on the same terms as active agents, and all six have taken advantage of this opportunity. Even if some consideration can be located in the record (the retired agents say that the Equitable stopped matching their FICA taxes), plaintiffs face a greater hurdle, the district court found: "None of the plaintiffs here entered into any special written agreement with Equitable in which the cost of their health insurance was 'locked in'". This finding, which is not clearly erroneous, makes it impossible for plaintiffs to prevail on a contract theory. For one basic element of a long-term contract is a writing signed by the party to be bound. ERISA provides that pension plans must be established in writing, *see* 29 U.S.C. § 1102(a)(1), which is a long way toward a statute of frauds—as is the Supreme Court's observation that under ERISA "every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan." *Curtiss–Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83, 115 S.Ct. 1223, 1230, 131 L.Ed.2d 94 (1995). Although § 1102(a)(1) does not cover all possible ground—it leaves open, for example, the possibility that a written plan may be combined with an oral promise, such as an undertaking to give a

worker twice the benefits so established— the utility of reducing retirement promises to writing and avoiding arguments about who said what to whom are so fundamental to both ERISA and contract law that an extension of the writing requirement to all long-term commitments is an inescapable ingredient of the federal common law slowly accumulating in ERISA's shadow. *Sprague* made this extension, and sensibly so. Cf. *Mohr v. Metro East Mfg. Co.*, 711 F.2d 69 (7th Cir.1983) (departure from terms of a collective bargaining agreement permissible only if in writing). All ten judges who sat in *Bidlack* relied on writings; none suggested that a wholly oral promise could require the employer to provide lifetime benefits. The district court wrapped up: "Because the evidence does not support a finding that plaintiffs entered into separate bilateral contracts with Equitable at the time of retirement, Equitable cannot be found liable under a breach of bilateral contract theory." No more need be said about the contract theory.

■ Next comes the argument that statements made to the retirees violated the Equitable's duty as a fiduciary under the plan (that is, as the plan's administrator). ERISA requires a trustee or other fiduciary to administer a plan "solely in the interest of the participants and beneficiaries" of the plan. 29 U.S.C. § 1104(a)(1). This statute was the basis of *Varity Corp. v. Howe*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), which held that an employer may not bilk employees into surrendering their pensions. (The strategy in *Varity* was to form a new corporation, bamboozle the employees into transferring their pension claims from a solvent firm to the new and thinly capitalized one, and then pull the plug on the new corporation, leaving the employees in the lurch and freeing the investors from the pension obligations.) And *Varity* is the basis of the retired agents' claim that they, too, are entitled to redress for a breach of fiduciary duty. They contend that § 1104(a)(1) is a guarantor of accurate information at all times. Any error in communicating a plan's terms, according to plaintiffs, violates the statutory duty and entitles the recipients of the infor-

mation to the benefits promised orally, rather than to those in the plan documents. Arguments of this kind are becoming common in *Varity*'s wake, see *Librizzi v. Children's Memorial Medical Center*, 134 F.3d 1302 (7th Cir.1998); *Sprague*, 133 F.3d at 404–06.

The claims made in *Varity* fell comfortably within the statute. The firm devised a scheme that transferred the corpus of the pension trust from the plan participants to the investors, a step that it was forbidden to take directly. Unlike *Varity*, the Equitable did not undertake a campaign of disinformation that led employees to surrender their benefits. The district court found (and again the finding is not clearly erroneous) that the Equitable trained its benefits staff to give correct advice. There has been no raid on plan assets (it has none; the Equitable's plan is a pay-as-you-go enterprise). Even when a plan is unfunded, § 1104(a)(1)(A) has bite in a sense familiar to corporate law: it imposes on the plan administrator and other fiduciaries a duty of loyalty, an obligation to act in the participants' interest. Deliberately favoring the corporate treasury when administering (as opposed to framing the terms of) a plan is inconsistent with the statute. See Daniel R. Fischel & John H. Langbein, *ERISA's Fundamental Contradiction: The Exclusive Benefit Rule*, 55 U. Chi. L.Rev. 1105 (1988). A duty of *loyalty* must be distinguished, however, from a duty of *care*. A corporate manager is the investors' fiduciary and must act loyally in their interests. But slipups in managing any complex enterprise are inevitable, and negligence—a violation of the duty of care—is not actionable. Quite the contrary, in corporate law managers rarely face liability even for gross negligence; if knowing how best to run a firm is a hard task for full-time managers, it is an impossible task for judges, who lack both the expertise and the incentives of managers.

Running a benefits plan is just one aspect of running a corporation, and the managers (and other employees) of a firm are no less apt to err in one endeavor than in another. Efforts to administer any complex plan fall short of the ideal. Some employees of a large firm will receive bad or misleading advice. Many ideas are hard to convey or grasp. Plans are complex, and the possibility of change in the plans makes exposition and decision difficult. How best should a benefits department express the idea that although it is the employer's current *policy* to freeze the benefits of retirees, this is not its legal *obligation*? Many persons, including some in the benefits department, won't grasp the difference when the policy has been unchanged for decades. Consider the letter on which the plaintiffs place their greatest reliance, a letter from the head of the benefits department to an agency manager, who then gave advice to three of the plaintiffs:

> Historically it has been the Equitable's position to consider people retiring on the effective date of a change to be considered "inactive" on that date and not affected by the changes. Although this "rule" is not cast in stone, nor required legally, it nonetheless remains our position.
>
> Consequently, Equitable employees, managers and agents returning on or before January 1, 1991 will continue to be covered under the Pre–1991 health plan with contributions, deductibles, stop loss and all other provisions of that plan applying.

When that letter was sent (August 1990) it was an accurate statement not only of the Equitable's practice but also of its intentions with respect to the amendments of 1991. Agents who retired in 1990 retained the benefits of the old plan, while those who remained received lower benefits. But in 1992 the Equitable changed its mind, as the letter had intimated that it could, and applied the new plan to retirees in 1993. The letter was technically accurate yet potentially misleading to someone who had a decision to make; it did not (and could not) provide complete information about what would happen to benefits some years hence. Plaintiffs testified to additional advice, much of it oral, that stressed the availability of "lifetime" benefits and omitted the qualifier that "this 'rule' is not cast in stone, nor required legally". Some benefits counselors may have had trouble distinguishing statements of the Equitable's current intention from statements about the contents of the plan. Some readers must have mentally added the word "unreduced" after a word such as "lifetime." Yet unless § 1104(a)(1) is a guarantor of accurate infor-

mation at all times and for the indefinite future—unless it creates not only a duty of care, but also a duty of prevision—then claims that one or another bit of advice was misleading do not violate this statute.

■ Section 1104(a)(1)(A) creates a duty of loyalty. Section 1104(a)(1)(B) creates a duty of care by requiring each plan's administrator to use "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims". This duty addresses overall management of the plan, particularly of its assets, rather than the quality of oral advice to beneficiaries. We need not decide whether (and, if so, how) § 1104(a)(1)(B) bears on oral advice, because, whatever this section does, it does not create a standard of absolute liability. A duty of care is not a duty of prevision. A plan administrator satisfies § 1104(a)(1)(B) by taking appropriate precautions—such as training the benefits staff and providing accurate written explanations—even if the precautions sometimes prove to be insufficient.

Treating § 1104(a) as establishing a duty to give plan participants whatever benefits someone on the staff led them to believe were available would undermine an essential principle established by ERISA: there are no oral variances from written plans. E.g., *Central States Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148 (7th Cir. 1989) (en banc); *Central States Pension Fund v. Joe McClelland, Inc.*, 23 F.3d 1256, 1257–58 (7th Cir.1994). Many cases in this line reject claims for medical benefits by plan participants who say that someone told them that one or another procedure was covered and incurred expenses in reliance on the assurance. E.g., *Plumb v. Fluid Pump Service, Inc.*, 124 F.3d 849, 856 (7th Cir.1997); *Schoonmaker v. Employee Savings Plan of Amoco Corp.*, 987 F.2d 410 (7th Cir.1993); *Pohl v. National Benefits Consultants, Inc.*, 956 F.2d 126 (7th Cir.1992); *Vershaw v. Northwestern National Life Insurance Co.*, 979 F.2d 557 (7th Cir.1992). ERISA requires firms to establish their plans in writing, to provide participants with written summary plan descriptions, and to furnish the full text of the plans on request. All of these provisions suppose that the written terms are the effective terms. Havoc would ensue if plans meant different things for different participants, depending on what someone said to them years earlier. Memory is weak compared to the written word, and there is a substantial risk that participants will not correctly recall what was said, will exaggerate (in their favor) what they heard, or will simply prevaricate in order to improve their position. Employers could do little to protect themselves against such claims—which is why ERISA calls for writings, and why we concluded above that a rule akin to the statute of frauds applies to all claims based on bilateral contracts. If it is hard now to administer plans that apply to all participants, it is impossible to see how any employer could administer a plan that meant something different for each participant, where the difference was not committed to writing. What is more (and perhaps worse), binding the plan's sponsor to the oral advice of its benefits staff might lead the employer to discontinue giving advice, telling participants to read the documents and draw their own conclusions. That step would protect employers, but it very likely would increase the level of misunderstanding among participants. We do not think that § 1104(a)(1)(B) takes back with the left hand the primacy of the written word that ERISA establishes with the right hand. *Sprague* said much the same thing, in a passage apropos here too:

> GM's failure, if it may properly be called such, amounted to this: the company did not tell the early retirees at every possible opportunity that which it had told them many times before—namely, that the terms of the plan were subject to change. There is, in our view, a world of difference between the employer's deliberate misleading of employees in *Varity Corp.* and GM's failure to begin every communication to plan participants with a caveat.

133 F.3d at 405. The district court's finding that the Equitable did not set out to deceive or disadvantage plan participants therefore forecloses plaintiffs' claim under § 1104(a)(1).

Plaintiffs repackage their fiduciary-duty argument as a contention that the Equitable is "estopped" to change the medical plan, but the semantic change actually weakens the point. It does not avoid the need for writings, which is why we held in *Russo v. Health, Welfare & Pension Fund,* 984 F.2d 762 (7th Cir.1993), that principles of estoppel are inapplicable to oral assertions in ERISA matters. Because some of the statements are contained in letters sent to the retirees, we press on. Federal practice (this variation of plaintiffs' claim depends on federal common law under ERISA) limits estoppel to cases in which one party has made an incorrect representation of fact, on which another reasonably relied to his detriment. *Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 59–61, 104 S.Ct. 2218, 2223–25, 81 L.Ed.2d 42 (1984). See also *Restatement (2d) of Torts* § 894 (1979); *Sprague,* 133 F.3d at 403–04. Statements of the kind to which the plaintiffs point—that retirees should expect to receive the health benefits in force at the date of their retirement, and that the Equitable did not plan to change this feature of its plans—were, when made, not false statements of fact. They were not false, because they accurately informed the agents about the operation of the plans the Equitable then had in force; and to the extent they were forward-looking, it was not clearly erroneous for the district court to conclude that they were statements not of "fact" but of present intention. That's a vital distinction in the law of estoppel (and its cousin, the law of fraud). See *Vaughn v. General Foods Corp.,* 797 F.2d 1403 (7th Cir.1986). Representations about plans and intentions could be false if, at the time the statements were made, the speaker actually had a different intention (*Ballone v. Eastman Kodak Co.,* 109 F.3d 117 (2d Cir.1997), appears to have concerned such a situation), but the district court found that plaintiffs had not proved lies of this kind. Instead the evidence showed that the statements were honest (if at times incautious) projections of present plans into the future. As it happened, higher management of the Equitable changed course in 1992, but this did not make the earlier statements false.

Reliance is a second hurdle for the plaintiffs. In federal law, a person cannot rely on an oral statement, when he has in hand written materials disclosing the truth. See *Teamsters Local 282 Pension Trust Fund v. Angelos,* 762 F.2d 522, 530 (7th Cir.1985). We have applied this principle repeatedly, in a variety of situations. *Minasian v. Standard Chartered Bank, PLC,* 109 F.3d 1212, 1215 (7th Cir.1997) (an oral statement contradicted by written documents cannot be fraud in contract law); *Carr v. CIGNA Securities, Inc.,* 95 F.3d 544 (7th Cir. 1996) (same principle in securities law). Our most recent application of this principle is to a mixed fiduciary-duty and estoppel claim under ERISA. *Schmidt v. Sheet Metal Workers' Pension Fund,* 128 F.3d 541, 546 (7th Cir.1997), rejects a claim that bad advice delivered verbally entitles plan participants to whatever the oral statement promised, when written documents provide accurate information. Both the plan and the summary plan descriptions accurately told the plaintiffs that the Equitable had retained the right to change or even discontinue the medical-care plan. See also *Gable v. Sweetheart Cup Co.,* 35 F.3d 851 (4th Cir.1994).

Then there is the requirement of detrimental reliance. The district judge found that, although plaintiffs may have relied on the advice they received, they did not do so to their detriment. Retired agents' benefits are not inferior to those active agents enjoy. Had plaintiffs remained in active employment, their medical benefits would have diminished in January 1991. By retiring before then, they retained the benefits of the old plan for another two years. So *none* of the elements of an estoppel has been established: no false statements of fact, no reliance, and no detriment.

The retired agents are worse off than they would be if the Equitable had left its old plan in force, but that has nothing to do with "estoppel." It stems from the fact that the employer used its power to change the plan. Plaintiffs' arguments really are efforts to avoid, through the back door, the holdings of *Bidlack, Murphy,* and *Senn* that a power expressly reserved may be used—and used, as *Lockheed* and *Georgia Pacific*

hold, without any need to consider the best interests of employees. See also *Chojnacki v. Georgia–Pacific Corp.*, 108 F.3d 810 (7th Cir.1997). When setting and changing the terms of a plan, the employer may act to promote its own interests, just as it may do when setting wages. In the short run use of this power may injure retirees; but in the longer run, knowledge that plans may be changed encourages employers to make better offers to their labor force. If employers knew that they were locked in, they would be more conservative in making promises, to the potential detriment of the workers. See *Heath v. Varity Corp.*, 71 F.3d 256, 258 (7th Cir.1995); *Georgia–Pacific*, 19 F.3d at 1189–90. What protects retirees is not a legal rule of fiduciary duty or estoppel, but the employer's desire to maintain a reputation for honest dealing with its workers; otherwise it will have difficulty attracting and retaining a skilled work force. The Equitable did not cut off its retirees; it treats retirees the same as active workers, which provides a form of vicarious protection for their interests. ERISA permits other firms to compete by offering vested benefits. But plaintiffs chose to work for a firm that had announced that it was reserving the right to reduce or eliminate health benefits, and they have no legal right to prevent the firm from exercising the option it retained.

Affirmed.