**Donald W. STEARNS, on behalf of himself and all others similarly situated, Plaintiffs,**

v.

**NCR CORPORATION and NCR Pre–65 Retiree Health Care Plan, Defendants.**

**No. CIV.98–2384 (JRT/FLN).**

United States District Court, D. Minnesota.

May 17, 2000.

Wood R. Foster, Jr. and Jordan M. Lewis, Siegel, Brill, Greupner, Duffy & Foster, Minneapolis, MN, for plaintiffs.

Scott T. Baken, Jackson, Lewis, Schnitzler & Krupman, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

TUNHEIM, District Judge.

This is a class-action lawsuit brought by former employees of defendant NCR Corporation ("NCR") under the Employee Retirement Income Security Act of 1974 (codified as amended at 29 U.S.C. §§ 1001–1461 (1994 & Supp. Ill.1997) and in scattered sections of Title 26 U.S.C.) ("ERISA"), to restore retirement benefits under an early retirement program offered by NCR and administered by defendant NCR Pre–65 Retiree Health Care Plan. This Court granted plaintiffs' motion to certify the class, represented by Donald W. Stearns ("Stearns"), on September 17, 1999.

Plaintiffs' complaint states three separate counts against defendants, including a claim for ERISA plan enforcement under 29 U.S.C. § 1132(a)(1)(B), a claim for breach of contract under the "federal common law" and 29 U.S.C. § 1132(a)(1)(B), and a claim for breach of fiduciary duty under 29 U.S.C. §§ 1132(a)(3) and 1109(a). This matter is before the Court on the parties' cross-motions for summary judgment. Defendants seek dismissal of all of plaintiffs' claims in their entirety. Plaintiffs seek summary judgment on the issue of liability only, with damages to be determined later. For the reasons stated herein, both motions are granted in part and denied in part.

## BACKGROUND

Few facts, if any, are in dispute. In 1993, NCR sought to reduce the size of its workforce in the United States by implementing a series of incentive programs in order to encourage employees to agree to either early retirement or voluntary separation from the company. The first of these programs offered enhanced retirement benefits to employees otherwise eligible for retirement benefits who were fifty years old or older, had at least ten years of service with the company, and who filed an election to retire during a short window of time between November 1 through December 17, 1993 (the "Early Out Program"). All retirements falling under the program became effective as of January 1, 1994. Plaintiffs' class consists of those NCR retirees who opted to retire early under the terms of the Early Out Program.[1]

Benefits offered to retirees under the program included a lump sum payment of $30,000, enhanced pension benefits (calculated without reduction for early retirement), and health insurance coverage at optimum levels to which they otherwise would not be entitled. In exchange, defendants required all retirees participating in the Early Out Program to sign statements of intent to retire and to release all potential legal claims arising out of their employment, including discrimination on the basis of age (the "Releases").

In September 1998, defendants notified all of NCR's retirees, including participants in the Early Out Program, of adverse changes to their health care benefits effective January 1, 1999. These changes required retirees to pay a percentage of their health care premiums, which NCR formerly covered in their entirety. The changes also required retirees to pay increased deductibles and co-payments, and eliminated benefits to retirees over the age of 64 which were formerly offered under NCR's Medicare supplement plan. Plaintiffs filed this action contesting the proposed amendments on November 4, 1998.

---

1. NCR later offered a "Voluntary Separation Program," under which NCR gave employees the opportunity to terminate their employment voluntarily in exchange for certain enumerated benefits. The terms of the Voluntary Separation Program generally were less favorable than those available to participants in the Early Out Program.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment, stating in pertinent part:

> [Summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Summary judgment is to be granted only when the evidence is such that no reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Initially, the movant bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In evaluating the movant's showing, the evidence offered by the non-moving party is to be believed and all justifiable inferences arising therefrom are to be drawn in the light most favorable to that party. *See Matsushita Elec. Indus. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When a moving party makes and supports a motion for summary judgment in accordance with Rule 56, a party opposing the motion may not rest upon the allegations or denials of its pleadings; rather, that party must "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 256, 106 S.Ct. 2505; *Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th Cir.1995). Accordingly, the nonmovant "must make a sufficient showing on every essential element of its case for which it has the burden of proof at trial." *Wilson v. Southwestern Bell Tel. Co.,* 55 F.3d 399, 405 (8th Cir.1995).

Summary judgment is particularly appropriate in cases such as this one, in which few facts are in dispute. Moreover, by filing cross-motions for summary judgment the parties appear to concede that the unresolved issues are issues of law rather than issues of fact.

## ANALYSIS

### I. Plan Enforcement Claim

Although complicated by a number of smaller issues, the parties' underlying positions in this matter are relatively simple. Defendants contend that plaintiffs' entitlement to health insurance under the Early Out Program was limited by a disclaimer notifying all of its employees that medical benefits were subject to amendment or termination by NCR. Plaintiffs argue that, unlike other retirees, they struck a bargain with NCR under the terms of which they are entitled to vested medical benefits. They contend that the asserted disclaimer does not apply to them because the Early Out Program constitutes an independent ERISA plan that is separate from the general NCR health care plan in which the disclaimer is located. They alternatively argue that, even if the Early Out Program is part of NCR's general health care plan, the disclaimer contained therein applies only to active employees and not to retirees.

### A. Status of the Early Out Program as an amendment to the existing plan

■ The documentary evidence offered by the parties in this case makes clear that the Early Out Program is not, as plaintiffs contend, a free-standing ERISA plan. Rather, NCR amended the basic health care plan that it provided for its employees at the time of the Early Out Program's inception (the "1993 Plan"), to provide enhanced coverage to early retirees under the program.

NCR distributed copies of the official plan document and summary plan descrip-

tion ("SPD") for that plan, entitled "1993 Group Benefits Plan for Salaried Employees," several months before announcing the Early Out Program. NCR first announced the Early Out Program on October 1, 1993, in a special newsletter to employees from Jerre Stead, an NCR Vice President. This newsletter generally outlined the program's eligibility requirements and stated that more detailed information concerning the program would be forthcoming.

NCR thereafter sent two separate memoranda dated October 6, 1993 to employees who were eligible for participation in the Early Out Program. These memoranda, although executed by two different NCR Assistant Vice Presidents and sent to two separate groups of employees, contained substantially the same information about the program. Each described a variety of "permanent plan amendments" to the 1993 Plan, which NCR expressed an intent to implement beginning January 1, 1994 for retirees who did not opt to participate in the Early Out Program. The memoranda further compared the coverage available to retirees under the "permanent plan amendments" with the coverage to which Early Out Program participants would be entitled.

Plaintiffs contend that by distinguishing its proposed "permanent plan amendments" from the terms of the Early Out Program, defendants acknowledged that the terms of that program were something other than amendments to the 1993 Plan. The Court disagrees. Defendants' use of the phrase "permanent plan amendments" in contrast with the Early Out Program terms merely suggests that the Early Out Program was not "permanent," in the sense that employees could only enroll in it during a very brief window of time. It does not suggest, as plaintiffs contend, that the Early Out Program was a free-standing ERISA Plan.

Importantly, the October 6 memoranda described the pension and health care benefits to which Early Out Program partici-

pants would be entitled as "Choice 2 (80/20) Health Care," "Option 1 (90/20) Health Care" or the "Supplemental Plan to Medicare," depending on the age of the individual retiree. These terms, standing alone, are not descriptive of the benefits to which Early Out Program participants would be entitled. An employee reading the memoranda in isolation would not understand the scope of his or her coverage, but would need to refer to some other document for a more complete description of the benefits offered under the program.

Plaintiffs argue that NCR provided such a description in a document sent to employees along with the memoranda entitled "1993 U.S. Group Enhanced Retirement Program Questions and Answers Guide," (the "Q & A Guide"). The Q & A Guide contains as an attachment a very thorough description of the benefits offered under "Option 1," "Choice 2" and the "Supplemental Plan for Medicare," defining everything from deductibles, co-payments, and out-of-pocket maximums to the degree of coverage offered for specifically enumerated medical, dental, and mental health services.

Plaintiffs point to the high degree of specificity contained in the attachment to the Q & A Guide and argue that this document, along with the October 6 memoranda and the Releases signed by participants in the program, constitute both the official plan documents and the SPD for a separate and independent ERISA plan.

This argument is undermined by language contained in the Q & A Guide that describes the attachment at issue as a mere summary and plainly refers Early Out Program participants to the 1993 Plan booklet for a description of the benefits offered. Under the subheading "Post Retirement Health Care Benefits," the Q & A Guide states. "A *summary* of each of the NCR retiree health care plans (Choice 2, Option 1, and the Supplemental Plan to Medicare) is attached for your reference." *Your* (sic) *should refer to our "Group*

*Benefits Plan bookler which was mailed to your home earlier this year for the details of the NCR Health Care Plans*" (emphasis in the original). Thus, the Q & A Guide does not itself purport to establish an independent plan, but rather, defines the benefits offered to participants within the text of the official plan document for the 1993 Plan.[2]

Other evidence in the record confirms that the Early Out Program does not constitute a separate ERISA plan. Defendants have submitted documents demonstrating that the members of NCR's Board of Directors executed various resolutions on December 13, 1993. One of these resolutions authorized NCR's ERISA Plan Administrator to implement various amendments to the 1993 Plan described in an attachment to the resolutions. This attachment includes a proposal to amend the 1993 Plan to incorporate the terms of the Early Out Program. This evidence shows that NCR had no intent upon implementing the Early Out Program to establish an independent ERISA plan, but rather, only to amend the plan that was already in existence.

Plaintiffs argue that although the NCR Board of Directors authorized the Plan Administrator to amend the 1993 Plan, he or she never exercised that authority. Nevertheless, defendants have submitted a document entitled "Group Benefits Plans—Amendments to the Summary Plan Descriptions," which contradicts plaintiffs' position. This document contains, *inter alia*, a written amendment to the 1993 Plan SPD to incorporate the terms of the Early Out Program.[3] Its existence belies any contention on the part of plaintiffs that the Plan Administrator failed to exercise his or her authority to amend the 1993 Plan. It further eliminates any possible doubt that defendants incorporated the terms of the Early Out Program into the 1993 Plan as an amendment, rather than establishing the program as an independent plan.

In light of this evidence, including the 1993 Plan SPD amendments, the NCR Board of Directors resolutions, and the above-quoted Q & A Guide language, the Court is compelled to find that the 1993 Plan was amended to incorporate the terms of the Early Out Program. Its asserted status as an independent ERISA Plan, therefore, does not permit plaintiffs to avoid the effects of the 1993 Plan disclaimer.

**B. Application of the 1993 Plan disclaimer to retirees**

Plaintiffs' argument that the 1993 Plan disclaimer does not apply to retirees is also without merit. The disclaimer at issue is contained under the heading. "Part I: General Provisions," and under the sub-

2. Plaintiffs contend that the Q & A Guide's reference to the 1993 Plan description is nonsensical, because that document contains no information about a plan entitled "Option 1." Nevertheless, the attachment to the Q & A Guide refers to the "Option 1" plan as synonymous with "Choice 1," a plan which the 1993 Plan description sets forth in a significant amount of detail. In light of these facts, the Q & A Guide's reference to the 1993 Plan description is consistent with information contained therein.

3. At first blush the relevance of this document to the case at bar is somewhat unclear, because it refers to a company entitled "AT & T Global Solutions Company" rather than "NCR." Moreover, it contains no reference to NCR's 1993 Plan description, the booklet entitled "Group Benefits Plan for Salaried Employees." Nevertheless, the record reflects that NCR changed its name to "AT & T Global Solutions Company" beginning in January 1994 and continuing for a few years thereafter. Thus, the amendments set forth in the document constitute amendments to NCR employee benefit plans. Furthermore, the document amends NCR plan number 502, entitled therein as "Group Benefit Plan for Management Employees of NCR Corporation." The December 13, 1993 NCR Board Resolutions make clear that plan number 502 and the "Group Benefits Plan for Salaried Employees" are one and the same. Therefore, although the paper trail is difficult to follow, the amendments described in the document at issue constitute amendments to the 1993 Plan SPD.

heading, "Section 12: Other Important Facts." It states, in relevant part, as follows:

> The Company reserves the right at any time or from time to time to amend the Plan in whole or in part .... No retroactive amendment shall be made unless required under ERISA, any other Federal law or under any applicable regulations thereunder. The Company reserves the right to change or cancel the Plan, or any benefits under the Plan, at any time. If the Company cancels the Plan or any benefits under the Plan, participation in the cancelled benefits would end on the date of cancellation.

Plaintiffs point to the definitions outlined in Section 1 of the General Provisions, which make clear that the term "Plan" as it is used throughout the 1993 Plan description is distinct from the term "Retirement Plan." They assume that retiree health care benefits fall within the scope of NCR's Retirement Plan, and on that basis argue that because the disclaimer omits any mention of the Retirement Plan it does not apply to them.

The assumption upon which plaintiffs' argument rests is erroneous. A review of the 1993 Plan booklet demonstrates that retiree health care benefits are not a part of NCR's "Retirement Plan," but rather, are a part of the 1993 Plan described therein. For example, the 1993 Plan booklet states that retirees may be eligible for the health care and life insurance benefits described in Part VII of the booklet if they "begin[ ] to draw a monthly pension benefit under the Retirement Plan." Thus, while the 1993 Plan provides health care, disability, life insurance and other welfare benefits to both active employees and retirees. NCR's Retirement Plan is an employee pension benefit plan.

Plaintiffs also contend that NCR is precluded from modifying retiree health care

benefits because the disclaimer states that "no retroactive amendment shall be made" to the 1993 Plan. They interpret the phrase "retroactive amendment" to refer to any modification or termination of employee benefits that have already vested. Plaintiffs construe this clause only to prohibit amendment to retiree health care benefits after retirement, and not to prohibit modifications to the benefits offered to active employees.[4] In so doing, they rely upon the implicit assumption that employee medical benefits vest at the time of retirement.

Defendants contest plaintiffs' interpretation, arguing that by including this clause in its disclaimer provision NCR intended merely to proscribe amendments that might retroactively diminish the rights of employees whose particular insurance claims had already been filed. Under defendants' construction NCR would be prohibited, for example, from enacting an amendment in May that would take effect the preceding March and thus affect the claims of an employee who sought health care in April.

The Court finds that the precise meaning of the retroactivity clause is somewhat ambiguous, although defendants' interpretation is the simplest and most plausible one. Courts generally interpret ERISA plan documents according to trust law principles under which the employer or plan provider stands in the shoes of the settlor, the plan administrator the trustee, and the employee the beneficiary. *See Barker v. Ceridian Corp.*, 193 F.3d 976, 979 (8th Cir.1999). Under these principles, when a term of the trust instrument is ambiguous courts may look to extrinsic evidence in order to determine the intent of the settlor. *See Jensen v. SIPCO, Inc.*, 38 F.3d 945, 950 (8th Cir. 1994).

---

4. A more broad interpretation of this clause as prohibiting amendment to both active and retired employee benefits would, of course, nullify the entire reservation of rights provision and require NCR to provide *all* 1993 Plan participants with vested health care benefits.

In this instance, although the Court finds ambiguity in the retroactivity clause at issue, reliance upon extrinsic evidence is unnecessary because this ambiguity is not so great as to permit plaintiffs' proposed construction. Plaintiffs' interpretation restricts the scope of the retroactivity clause in a manner that is unsupported by the plain language of the document. Its location within the "General Provisions" section of the 1993 Plan booklet and within a subsection pertaining generally to the entire 1993 Plan demonstrates that the retroactivity clause applies to all plan provisions, including those applicable to both active and retired employees. Plaintiffs' construction reads into the clause a limitation to retirees that plainly does not exist. Moreover, even accepting plaintiffs' interpretation to be permissible, they have offered no extrinsic evidence from which the Court might conclude that NCR intended to provide retirees with vested medical benefits. They have for these reasons failed to meet their burden of proving that NCR provided retirees with vested medical benefits by including the retroactivity clause within its general reservation of rights provision. *See Howe v. Varity Corp.*, 896 F.2d 1107, 1109 (8th Cir.1990) ("Plaintiffs have the burden of proving vested welfare benefits.").

In support of their position plaintiffs rely on language found in the Eighth Circuit's opinion in *Jensen*, 38 F.3d at 951–52, for the proposition that in ERISA cases a "retroactive amendment" means an amendment to retiree benefits. The text upon which plaintiffs rely states

> To put the issue in trust law terms, either the reservation-of-rights provisions in the plan documents must be

construed as conferring only a power to modify plan benefits prospectively (that is, for salaried employees not yet retired), or SIPCO relinquished the broader power to modify benefits for those already retired.

*Id.*

Plaintiffs note that in this paragraph the Eighth Circuit used the term "prospectively" to refer to an amendment affecting only active employees. From this observation they jump wildly to the conclusion that whenever an ERISA plan document uses the term "retroactive" it pertains to an amendment affecting retiree health care benefits, regardless of the context in which that term is used. The Court does not agree that the text of *Jensen* may be read so broadly as to support the rule that plaintiffs advocate. Rather, it appears that the *Jensen* court merely used the term "prospectively" as a short-hand means of conveying, for the purpose of that particular opinion, the concept of amendment to active employee benefits. *Jensen* does not purport to set forth an inviolable rule of ERISA plan construction with regard to the use of that term.[5]

For these reasons, the Court concludes that neither the text of the disclaimer provision nor the extrinsic evidence supports plaintiffs' contention that the retroactivity clause prohibits NCR from modifying retiree medical benefits. Plaintiffs have therefore failed to support their claim that the disclaimer provision does not apply to NCR retirees in general.

## II. Breach of Contract Claim

Although the Court finds that the Early Out Program constitutes an amendment to

---

5. The Court observes that *Jensen* is distinguishable from the case at bar on several grounds. First, the reservation of rights provision in that case contained a proviso stating, "Unless otherwise expressly provided therein, amendments [to the company's pensioner medical plan] shall not be applicable to persons who are receiving pensions." *Jensen*, 38 F.3d at 949. The court reasoned that this language left "some doubt" as to whether the company intended to reserve the right to modify benefits for persons who were already retired. *Id.* at 950. In this case, the disclaimer at issue does not give rise to similar doubts. Moreover, the court in *Jensen* premised its findings on "overwhelming extrinsic evidence" that the company intended that retiree medical benefits would vest upon retirement. In the case at bar, no such evidence has been offered.

the 1993 Plan, and that the 1993 Plan disclaimer applies generally to NCR retirees, these findings do not conclude the Court's inquiry. As an alternative basis for their claims plaintiffs contend that, unlike other NCR retirees, they have executed bilateral contracts with NCR pursuant to which it is obligated to provide them with vested health care benefits. They seek enforcement of these contracts under ERISA, 29 U.S.C. § 1132(a)(1)(B), and under federal common law.

■ ERISA divides employee benefit plans into two separate categories, namely, pension plans and welfare plans. *See Anderson v. Alpha Portland Indus., Inc.,* 836 F.2d 1512, 1516 (8th Cir.1988). While pension plans establish retirement income for employees, *see id.,* welfare plans provide almost any other kind of fringe benefit, including medical benefits, disability benefits, life insurance, vacation pay, and other forms of non-compensation, *see id.; Frahm v. Equitable Life Assurance Soc'y,* 137 F.3d 955, 957 (7th Cir.1998). Impertantly, although ERISA subjects pension plans to stringent vesting requirements, it exempts welfare plans from those same requirements. *See Anderson,* 836 F.2d at 1516 (citing 29 U.S.C. §§ 1053, 1051). Thus, "[w]elfare benefit plans may be modified or terminated absent the employer's contractual agreement to the contrary." *Howe,* 896 F.2d at 1109. This rule applies to health care plans covering retirees as well as those covering active employees. *See id.* at 1109–10. Moreover, the Eighth Circuit has held that an employer's mere statement that medical benefits will "continue in retirement" or "until the death of the retiree" does not give rise to a presumption that the benefits vest for life upon retirement. *See id.*

Nevertheless, courts recognize that an employer may relinquish its freedom not to vest medical benefits if it chooses to do so. *See, e.g., Inter–Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Ry. Co.,* 520 U.S. 510, 515–16, 117 S.Ct. 1513, 137 L.Ed.2d 763 (1997). To be enforceable an employer's promise to provide vested benefits "must be reduced to writing and incorporated, in some fashion, into the formal written ERISA plan." *United Paperworkers Int'l Union v. Jefferson Smurfit Corp.,* 961 F.2d 1384, 1386 (8th Cir.1992).

In the case at bar the parties entered into an agreement pursuant to which plaintiffs waived potential legal claims against NCR and elected early retirement in exchange for severance pay, enhanced pension benefits, and enhanced medical benefits. Whether this agreement prohibits defendants from modifying the terms of plaintiffs' enhanced medical benefits depends first, on whether it is enforceable under the terms of the ERISA plan, and second, on whether it promises vested medical benefits.

■ The Eighth Circuit has not yet addressed whether a bilateral contract for vested medical benefits is enforceable under ERISA in the context of an early retirement inducement program. Nevertheless, it has recognized that employers and employees may contract for such benefits in the context of a collective bargaining agreement. *See United Paperworkers,* 961 F.2d at 1386. Thus, the general notion that a bilateral agreement between employer and employee for ERISA welfare benefits may be enforceable under appropriate circumstances is recognized under the law of this circuit. Other circuits also support this notion. In *Frahm,* 137 F.3d at 957, Judge Easterbrook of the Seventh Circuit observed that no theoretical basis exists for declining to enforce individualized agreements pertaining to health care benefits when such agreements are properly formed and documented:

The [defendant] denies that a personal agreement is possible, but we see no reason in principle why not. . . . Bilateral agreements on the length of vacation and amount of severance pay are common, and if these are proper then bilateral agreements about health care also must be proper. A firm could award

severance pay equal to the expected difference between the firm's medical plan and full coverage, leaving the employee to buy a policy covering the gap. If this is proper, what's wrong with a promise to provide medical care in kind?

*Id.* The Court finds these arguments persuasive, and agrees that individualized bilateral contracts for ERISA welfare benefits generally are enforceable.

Nonetheless, courts addressing claims for enforcement of such contracts disagree about the requirements they must meet in order to permit recovery of the ERISA welfare benefits promised therein. In *Sprague v. General Motors Corp.*, 133 F.3d 388, 402–03 (6th Cir.1998) (en banc), the Sixth Circuit addressed factual circumstances nearly identical to those present in the case at bar. There, as in this case, employees who participated in the defendant's early retirement incentive program sought damages based on the defendant's decision to modify the health care benefits initially promised to them under that program. *See id.* at 394–95. In exchange for these benefits the defendant required many of them to sign statements electing voluntary early retirement, and in some cases, waiving any potential claims for discrimination or other wrongful discharge. *See id.* Rejecting the plaintiffs' argument that these statements created binding contracts for vested medical benefits, the court held that they were unenforceable because they did not profess to be formal ERISA plan amendments and were not themselves independent ERISA plans. *See id.* at 402–03. The court reasoned that ERISA requires every plan to be in writing so that employees may determine their rights and obligations upon examining the plan documents, *see id.* at 402, and concluded that, "[a]ltering a welfare plan on the basis of non-plan documents and communications, absent a particularized showing of conduct tantamount to fraud, would undermine ERISA," *id.* at 403. Thus, under *Sprague*, agreements such as those at issue in this case are not enforceable un-

less the agreements themselves constitute formal amendments to the ERISA plan.

The Court respectfully disagrees with the decision in *Sprague*. No fewer than five judges dissented from the majority opinion in that case on this issue. The dissenting judges emphasized that the early retirees, unlike other employees, gave up significant rights in exchange for the benefits promised to them. *See id.* at 406–07, 413. Thus, in seeking to enforce the terms of the early retirement program they were not merely attempting to held their employer to the terms of a gratuitous promise set forth outside the ERISA plan documents, but instead were seeking to enforce the terms of an independent bargain supported by substantial consideration. The *Sprague* majority failed even to acknowledge this important distinction. The result in *Sprague* shields employers from their obligations under their own contracts, regardless of the sacrifices made in exchange for them, when said contracts do not themselves purport to be amendments to the formal ERISA plan documents. Since employers control the content of the ERISA plan documents, the *Sprague* decision in effect gives them carte blanche license to offer inducements to employees to waive their rights and then to renege on their promises after the employees have irrevocably done so. Nothing in ERISA requires courts to sanction such an unfair result.

In so holding, the Court does not intend to suggest that extra-ERISA plan contracts for health care benefits are enforceable regardless of form. In *Frahm*, 137 F.3d at 958, the court recognized that such contracts must be true contracts supported by adequate consideration. Moreover, citing ERISA's requirement that all employee benefit plans be in writing, *see* 29 U.S.C. § 1102(a); *Curtiss–Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995), the court further reasoned that this requirement logically should extend to all long-term commitments pertaining to employee bene-

fits. *See Frahm,* 137 F.3d at 958 ("[T]he utility of reducing retirement promises to writing and avoiding arguments about who said what to whom are so fundamental to both ERISA and contract law that an extension of the writing requirement to all long-term commitments is an inescapable ingredient of the federal common law slowly accumulating in ERISA's shadow."). Furthermore, the Eighth Circuit has indicated that, in addition to a writing requirement, an additional requirement exists such that no bilateral contract for health care benefits is enforceable unless "incorporated, in some fashion, into the formal written ERISA plan." *United Paperworkers,* 961 F.2d at 1386.[6]

The Releases at issue in this case meet the requirements set forth in *Frahm* and in *United Paperworkers.* Defendants required each of the plaintiffs in the class to sign the Releases, entitled "Election to Volunteer for the Enhanced Retirement Program and Release of Claims," in order to participate in the Early Out Program. Each of these documents was signed by both the individual plaintiff and an NCR human resources representative, and sets forth each plaintiff's intent to retire under the program and to release his or her employment claims against NCR in exchange for "a package of benefits that exceeds the benefits that [the employee] would normally receive." [7] The Releases thus constitute agreements that are in writing, signed, and supported by consideration. They therefore meet the requirements of written bilateral contracts.

■ Moreover, NCR's formal amendments to the 1993 Plan SPD establishing the Early Out Program arguably incorpo-

rate the terms of the Releases into the 1993 Plan. The amendments state that, as a qualification for participation in the Early Out Program, employees must have "submitted an application for retirement benefits between November 1 and December 17, 1993." The amendments do not otherwise clarify what kind of an "application for retirement benefits" an employee must submit in order to participate in the Early Out Program, and as a result, the meaning of this provision is ambiguous. As noted *supra,* courts may consider extrinsic evidence when interpreting the provisions of an ERISA plan that is ambiguous. *See Jensen,* 38 F.3d at 950.

■ In this case, the extrinsic evidence overwhelmingly demonstrates that defendants required employees to sign the Releases in order to participate in the Early Out Program. Such evidence includes an October 27, 1993 letter to potential Early Out Program Participants from an NCR Vice President stating that the election form initially introduced for participation in the program had been revised to include a release of potential employment claims. This letter included as attachments both a copy of the Release, and a document entitled "Questions and Answers about Revised Election Form." In response to a question about whether employees could enroll in the Early Out Program without signing the Release, NCR answered. "No. Signing the release is a requirement for receiving the enhanced benefits." The record contains no evidence whatsoever of any other release, contract, application or other document required by NCR from employees who wished to participate in the program. Thus, the Release signed by each participant and the "application for

---

**6.** The bar established in *United Paperworkers* appears to be much lower than that set forth in *Sprague.* While the *Sprague* court held no bilateral contract to be enforceable unless the contract itself constitutes a formal plan document, *United Paperworkers* acknowledges that, at least in the context of collective bargaining agreements, such contracts may be enforceable if merely "incorporated, in some fashion" into the written plan.

**7.** Although the Releases themselves do not set forth the precise terms of the Early Out Program, these details are documented in writing in the various memoranda and other communications that NCR sent to plaintiffs prior to their enrollment in the program. These memoranda constitute extrinsic evidence of the contracting parties' intent.

retirement benefits" referenced in the 1993 Plan amendments appear to be synonymous. Stated another way, the Court concludes that NCR's intent was to amend the 1993 Plan to incorporate the terms of the Early Out Program and to require, among other things, that participants sign the Releases in order to participate in the program. Moreover, because the executed Releases are a requirement for participation in the Early Out Program that is explicitly set forth in the 1993 Plan amendments, the Court further concludes that the amendments incorporate the terms of the Releases into the terms of the 1993 Plan. Thus, although the Releases themselves are not formal ERISA plan documents, they are in writing and "incorporated, in some fashion, into the formal written ERISA plan." *United Paperworkers*, 961 F.2d at 1386. On these grounds in the context of an early retirement incentive, the Court holds that the terms of the Releases, including the promise of enhanced benefits, are enforceable under the federal common law governing ERISA.

■ In order to prevail on their breach of contract claims, plaintiffs must also demonstrate that under the terms of the Releases they are entitled to enhanced medical benefits that vested on the date of their retirement. Because the Releases constitute independent bilateral contracts between the parties, the Court interprets them as it would any other contract according to basic principles of contract interpretation. Applying these principles, the Court finds that the Releases conferred upon plaintiffs an entitlement to vested medical benefits.

■ Defendants notably excluded any mention of the disclaimer from the Releases themselves. Generally, when a contract lacks any enumerated contingencies, the consideration promised under that contract is not subject to unilateral amendment.

Thus, under a plain reading of the contract language defendants are obligated to provide plaintiffs with the "enhanced benefits" referenced therein. They now seek to avoid that obligation even though plaintiff's have irrevocably performed their obligations under the contract by retiring and releasing all potential claims arising from their employment.

Defendants point out that the Releases do not themselves describe the enhanced benefits to which Early Out Program participants are entitled, but rather, the Court must look to the communications about the program from NCR to its employees in order to ascertain the parties' intent. These communications, in turn, refer employees to the 1993 Plan booklet for a precise description of the benefits available under the "Option 1," "Choice 2," and "Supplement to Medicare" plans. Based on these facts, defendants take the position that the disclaimer contained in the booklet applies to all benefits described therein, including those available to participants in the Early Out Program under the enumerated medical plans. Thus, under defendants' interpretation of the Releases, the enhanced benefits for which plaintiffs contracted are subject to amendment or termination under the 1993 Plan disclaimer.

The Court does not find these arguments to be persuasive. At most, they demonstrate an ambiguity in the contract as to whether the benefits conferred upon plaintiffs are vested. For the above reasons the Court finds that the Early Out Program constitutes an amendment to the 1993 Plan. By definition this amendment changed the Plan terms, and therefore, not all limitations set forth in the 1993 Plan booklet apply to program participants.[8] Which limitations apply to the enhanced benefits and which limitations do not apply is unclear. In order to understand that the disclaimer applied. Early

---

8. For example, retirees in the 55 to 61 age bracket were not entitled to Option 1/Choice 1 health care coverage under the terms of the 1993 Plan prior to its amendment. Under the amended plan, however, participants in the Early Out Program within this age bracket are entitled to such coverage.

Out Program participants would have had to refer to the entire 1993 Plan booklet and surmise indirectly that the disclaimer extended to the enhanced benefits promised under the contract simply because basic descriptions of the "Option 1," "Choice 2," and the "Supplement to Medicare" plans are outlined in the same booklet. Most plan participants, unschooled in intricacies of the law, would not reach this understanding based on the language contained in the releases. Plan participants who were otherwise aware of the disclaimer would reasonably believe it to be a general limitation on benefits that did not apply to them because, unlike other employees, they gave valuable consideration to defendants in exchange for their benefits.

Thus, contrary to defendants' suggestion, the 1993 Plan disclaimer does not clearly apply to the Releases upon which plaintiffs base their breach of contract claim. To the extent that the Releases are ambiguous, general principles of contract construction require the Court to interpret such ambiguity against defendants. *See* Restatement (Second) of Contracts § 206 (stating the rule of contra proferenturn, that ambiguities in a contract generally are construed against the drafter).

Defendants nevertheless point to extrinsic evidence in the record showing that NCR encouraged potential Early Out Program participants to attend various seminars and satellite broadcasts during which NCR informed employees that it reserved the right to amend or terminate the health care benefits promised to them under the program. They suggest that plan participants therefore should have known that the promised health care benefits were subject to its reservation of rights when they elected to retire.

This evidence does not persuade the Court that plaintiffs reasonably should have known that their health care benefits were subject to modification. Attendance at the seminars and satellite broadcasts upon which defendants rely was clearly voluntary, and defendants otherwise made no effort to ensure that Early Out Program participants understood that it could change or terminate their promised benefits unilaterally at any time. Thus, participants who did not attend the voluntary information sessions had little reason to believe that their medical benefits were not vested. Moreover, even participants who attended these sessions may have missed defendants' critical disclosures because the disclosures were made orally and without written confirmation.[9] Lacking evidence of any clear and unambiguous communication to all Early Out Program participants that their health care benefits were subject to modification, the Court finds that they had a reasonable expectation under the contracts they signed that the enhanced medical benefits promised to them were vested. For these reasons, the Court construes the Releases as bilateral contracts for vested medical benefits. The Court further finds that these contracts are incorporated into the 1993 Plan and enforceable under it. The Court has no confidence that Early Out Program partic-

9. Defendants point to two written documents which they claim informed potential Early Out Program participants that their proposed medical benefits would not vest. These documents include a seminar hand-out that states, "Post Retirement Medical: The intentions (sic) is not to create a benefit that did not previously exist. Plans without post retirement medical would maintain same status. Plans with low level (Plan B) would maintain same status." This statement appears to address program eligibility for employees who otherwise were not entitled to benefits under the 1993 Plan, and does not relate to the vesting of benefits. At best this statement is too vague and ambiguous to clearly notify plaintiffs of NCR's purported reservation of rights. Defendants also point to a December 15, 1993 newsletter that NCR sent to its employees. This newsletter states that NCR could not guarantee that "the health care plan for active associates and retirees" would not change. This statement appears to be a general reservation of NCR's right to amend the 1993 Plan provisions, and does not specifically address the entitlement of Early Out Program retirees to vested benefits.

ipants understood when they relinquished valuable rights to sue for age discrimination that medical benefits received in return could be slashed unilaterally by defendant. ERISA should not be read to sanction such actions. Plaintiffs' motion for summary judgment on this claim is granted accordingly.

## III. Breach of Fiduciary Duty Claim

In addition to their plan enforcement and breach of contract claims, plaintiffs also assert alternatively that defendants breached their fiduciary duties under ERISA, 29 U.S.C. §§ 1132(a)(3) and 1109(a), by failing properly to advise plaintiffs that their medical benefits under the Early Out Program did not vest. Because the Court finds that plaintiffs' medical benefits vested, this alternative argument fails.

## ORDER

Based on the foregoing, and all of the records, files and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' cross-motion for summary judgment [Docket No. 46] is **GRANTED in part** and **DENIED in part.**

2. Counts I (ERISA Plan Enforcement) and III (Breach of Fiduciary Duty) of plaintiffs' complaint are **DISMISSED, with prejudice.**

3. Defendants' cross-motion for summary judgment is denied in all other respects.

4. Plaintiffs' cross-motion for summary judgment [Docket No. 56] is **GRANTED in part** and **DENIED in part.**

5. The Court hereby **DECLARES** that defendants are liable under Count II of plaintiffs' complaint (Breach of Contract).

6. Plaintiffs' cross-motion for summary judgment is denied in all other respects.